MOUNT GRAHAM COALITION; National Audubon Society; Friends of the Earth; Defenders of Wildlife; Save America's Forests; Sierra Club; Humane Society of the U.S.; Maricopa Audubon Society; Huachuca Audubon Society; Northern Arizona Audubon Society; Prescott Audubon Society; Tucson Audubon Society; Yuma Audubon Society; Arizona Wildlife Federation; Biodiversity Legal Foundation; Southwest Center for Biological Diversity; Student Environmental Action Coalition, Southwest Chapter; Sky Island Alliance; Robin Silver; David Hodges; Roger Featherstone, Plaintiffs–Appellants,

v.

Jack Ward THOMAS, Chief of the United States Forest Service; Michael Espy, Secretary of the Department of Agriculture; Bruce Babbitt, Secretary of the Department of Interior; Mollie Beattie, Director of the United States Fish and Wildlife Service, Defendants–Appellees,

and

State of Arizona Board of Regents, Defendant–Intervenor– Appellee.

No. 96–16017.

United States Court of Appeals, Ninth Circuit.

Submitted to Motions Panel June 12, 1996.

Decided June 17, 1996.

As Amended July 23, 1996.

Eric R. Glitzenstein, Meyer & Glitzenstein, Washington, D.C., for Plaintiffs–Appellants.

Mark R. Haag, United States Department of Justice, Washington, D.C., for Defendants–Appellees.

David C. Todd, Patton Boggs, Washington, D.C., for Defendant–Intervenor–Appellee.

Before: CANBY, JOHN T. NOONAN and LEAVY, Circuit Judges.

### ORDER

Appellants Mount Graham Coalition and others ("the Coalition") have filed an emergency motion for a stay pending appeal. The Coalition seeks to stay the order of the District Court for the District of Arizona dissolving its injunction against further construction or site preparation for a telescope on Peak 10,477 in the Coronado National Forest in Arizona. We deny the stay because we conclude that the Coalition's appeal fails to raise a serious question on the merits. *See Lopez v. Heckler,* 713 F.2d 1432, 1435 (9th Cir.), *rev'd on other grounds,* 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1983).

The history of this dispute over the attempts of the University of Arizona to locate a new telescope in the Mount Graham area of Arizona, where an endangered red squirrel species lives, is recounted in our many earlier decisions dealing with the matter. *See Mt. Graham Red Squirrel v. Yeutter,* 930 F.2d 703 (9th Cir.1991) ("*Red Squirrel I*"); *Mt. Graham Red Squirrel v. Madigan,* 954 F.2d 1441 (9th Cir.1992) ("*Red Squirrel II*"); *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568 (9th Cir.1993) ("*Red Squirrel III*"); *Apache Survival Coalition v. United States,* 21 F.3d 895 (9th Cir.1994) ("*Red Squirrel IV*");

*Mount Graham Coalition v. Thomas,* 53 F.3d 970 (9th Cir.1995) ("*Red Squirrel V* ").

In 1988, while the University was dealing with the Forest Service and the Fish and Wildlife Service concerning compliance with the Endangered Species Act ("ESA") and the National Environmental Protection Act ("NEPA"), Congress intervened by enacting a provision of the Arizona–Idaho Conservation Act ("AICA"), 102 Stat. 4597, 4597–99 (1988), that selected one of the Forest Service's Alternatives, known as RPA 3, for locating the telescope project and directed the Secretary of Agriculture to approve it. The Act specified that, for the portion of the project within RPA 3, the requirements of Section 7 of the Endangered Species Act "shall be deemed satisfied," as shall the requirements of Section 102(2)(c) of NEPA. *Id.* at 4597, 4599. The effect was to obviate further need for compliance with ESA and NEPA in locating the telescope according to RPA 3. Thereafter, the University decided that its preferred location for its Large Binocular Telescope ("LBT") was Peak 10,477. The Forest Service was willing, and designated Peak 10,477 as alternative site 2 ("ALT 2").

Further dispute then arose as to whether Peak 10,477 was within the RPA 3 area approved by Congress. The district court determined that it was not, and that the University, the Forest Service, and the Fish and Wildlife Service had violated ESA and NEPA by relocating their planned telescope site to Peak 10,477. The district court accordingly enjoined the University from further work or site preparation on Peak 10,477 until ESA and NEPA requirements were met. We agreed with the district court and upheld its injunction in *Red Squirrel V,* 53 F.3d at 977. We stated: "Our conclusion does not compel the construction of the LBT on the site noted in RPA 3 Figure A regardless of new environmental information or the effect it could have on the red squirrel. Rather, we simply hold that, in order to relocate the LBT, the FS must comply with the requirements of the ESA and NEPA." *Id.* at 977.

In 1996, long after *Red Squirrel V* had become final, Congress enacted a rider to the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. 104–134, § 335, which provided:

> The United States Forest Service approval of alternative site 2 (ALT 2), issued on December 6, 1993, is hereby authorized and approved and shall be deemed to be consistent with, and permissible under, the terms of Public Law 100–696 (the Arizona–Idaho Conservation Act of 1988).

Alternative site 2, as we said, is Peak 10,477. Upon the passage of this legislation, the University moved the district court for relief from judgment under Fed.R.Civ.P. 60(b). The district court dissolved its injunction, enabling the University to proceed with preparation of its site on Peak 10,477. Upon motion of the Coalition, Judge Canby entered a temporary stay of the district court's order in· order to permit this motions panel to address the Coalition's emergency motion for stay. The motions panel heard telephonic arguments on June 12, 1996. We now deny the stay.

The Coalition contends that Congress's recent rider violates the separation of powers, as recently delineated in *Plaut v. Spendthrift Farm, Inc.,* — U.S. —, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). Specifically, the Coalition argues that Congress has impermissibly overturned a final judgment of an Article III court.

In our view, no serious question is raised that Congress's rider accomplishes that forbidden result, or that *Plaut* is applicable. *Plaut* invalidated an attempt of Congress to revive claims that had been dismissed as untimely in earlier, final judicial decisions. The Supreme Court held that, "[b]y retroactively commanding the federal courts to reopen judgments, Congress has violated [the] fundamental principle" that the judiciary is established to render dispositive judgments. *Id.* at —, 115 S.Ct. at 1453.

*Plaut* was careful, however, to point out that cases like *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855), in which congressional legislation "altered the prospective effect of injunctions entered by Article III courts" were different. "These cases distinguish

themselves; nothing in our holding today calls them into question." *Plaut,* —— U.S. at ——, 115 S.Ct. at 1459.

■■■ The rider in issue does not purport to revive a dead claim. To the extent that the district court may have granted declaratory relief that the Forest Service, the Fish and Wildlife Service, and the University had violated ESA and NEPA, that declaration is unaffected by the rider. The rider states that ALT 2—the Peak 10,477 site—"is hereby" approved and "shall be deemed" to be authorized by AICA. Those are terms of present and future, not retroactive, effect. At the very least, the rider is reasonably susceptible to such prospective interpretation, when to read it as somehow undoing past judgments would render it unconstitutional. We are required to adopt a constitutional reading when such an interpretation is reasonable, as it is here. *George Moore Ice Cream Co. v. Rose,* 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933).[1]

Thus this case falls squarely within *Wheeling Bridge,* in which a bridge had been declared to be a nuisance to navigation and had been ordered removed by an Article III court. Congress intervened with legislation declaring the bridge to be a lawful road passage, and its exercise of that power was upheld and the bridge was spared by the courts. The Supreme Court acknowledged that if there had been a damages award, it would have been beyond the power of Congress to modify, but because the decree was prospective, Congress's statute could be given effect.

> If, in the meantime, since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain that the decree of the court cannot be enforced.... Suppose the decree had been executed, and after that the passage of the law in question, can it be doubted but that the defendants would have a right to reconstruct it? And is it not equally clear that the right to maintain it, if not

abated, existed from the moment of the enactment?

*Id.* at 431–32. Thus in *Wheeling Bridge,* as here, there was no violation of separation of powers. *See also Hodges v. Snyder,* 261 U.S. 600, 603–04, 43 S.Ct. 435, 436–37 (1923) (judgment enforcing a public right, obtained by individuals for their own benefit, may be annulled by subsequent legislation).

■■■ Nor is the rider here rendered suspect because it is targeted at a single controversy. The legislation in *Wheeling Bridge* was similarly targeted, as was Congress's recent legislation known as the Northwest Timber Compromise, which declared that adherence to it provisions would constitute compliance with the existing statutes that were the basis of two named pending cases. *See Robertson v. Seattle Audubon Society,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). Indeed, *Plaut* itself makes the point that particularity does not render legislation suspect. *Plaut,* —— U.S. ——, n. 9., 115 S.Ct. at 1463, n. 9.

■■■ The Coalition concedes in this case that Congress had the power to change the law to accomplish the result that the district court reached. It argues only that Congress used the wrong words and thereby violated the separation of powers. That is the prime difference between this case and *Plaut.* The point of *Plaut* is that Congress could not constitutionally accomplish the result it sought—that of reviving claims that had been finally adjudicated and dismissed. Here Congress used a shorthand when it referred to ALT 2, but it is entitled to incorporate a description by reference into its legislation. The rider in terms then specifies that the selection of that site falls within the authorization of AICA. That is a change in AICA, which Congress is entitled to make. *See Robertson,* 503 U.S. at 441, 112 S.Ct. at 1414–15 (Northwest Timber Compromise amended applicable law, and therefore did not violate rule of *United States v. Klein,* 80 U.S. 128, 20 L.Ed. 519 (1871), which prohibits Congress from directing a particular decision in a case

---

**1.** We do not view as reasonable the alternative construction of the rider offered by the Coalition—that it renders the use of Peak 10,477 permissible but still subject to ESA and NEPA. If that were the effect of the rider, Congress would have accomplished nothing by it.

without repealing or amending the law underlying the decision).

We conclude, therefore, that the Coalition has raised no serious legal argument that Congress's rider violates the separation of powers. As a consequence, we need not address the balance of equities or comparison of hardships involved in the granting or denial of the stay; we only observe that both sides make plausible arguments of some hardship. The motion of the Coalition for stay pending appeal is

DENIED.

NOONAN, Circuit Judge, concurring:

On April 24, 1995, this court affirmed the judgment of the district court enjoining construction of a site for the Large Binocular Telescope (LBT) on Peak 10,477 of Mount Graham. We stated: "We hold that the AICU does not provide the FS [Forest Service] with the authority to select a site for the LBT other than that indicated in RPA 3 without complying with the ESA and NEPA." *Red Squirrel V*, 53 F.3d at 977. On April 25, 1996, the House of Representatives passed as a rider to an appropriations bill the provision that is at issue in this case.

Unpreceded by hearings or committee report, the rider was explained by its sponsor, who asked "Why was this legislation necessary?" and answered his own question by quoting from the losing government brief and the dissenting judge in *Red Squirrel V*: the language was necessary in order to vindicate these views that the court had rejected. 142 Cong.Rec. H4100 (daily ed. April 25, 1996). The appropriations bill, with the rider virtually irremovable once attached, was passed by the Senate and signed into law by President Clinton on April 26, 1996. Thereafter, appellees, invoking this new legislation, successfully moved the dissolution of the injunction.

A more explicit intervention of Congress into a judicial proceeding would be difficult to imagine. The ESA and NEPA are not amended. How a biological species should be defined is not changed. No new rules are prescribed for the balancing of environmental harms against the acquisition of new knowledge. The more particular terms of the Arizona–Idaho Conservation Act (AICA) are not altered. Instead, an administrative action of the Forest Service (the FS) is legislatively approved and, in addition, the legislature makes its own interpretation of AICA. The legislature's approval of the action of the FS effectively overrules *Red Squirrel V*. The legislative interpretation of AICA substitutes Congress's reading of AICA for that made by this court. In both parts of the statute Congress intervenes to destroy what appeared to be a final judgment of this court.

Intervention of this kind is generally not permitted by our constitutional allocation of power. *Plaut v. Spendthrift Farm, Inc.*, —— U.S. ——, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). "A legislature without exceeding its province cannot reverse a determination once made, in a particular case, though it may prescribe a new rule for future cases." *The Federalist No. 81*, at 545 (Alexander Hamilton) (J. Cooke ed. 1961). The distinction is evident between upsetting judgment in a decided case and legislating for a class of future cases. In our case the language of the rider appears to nullify a judgment in a particular case in precisely the way condemned by *Plaut*. *See id.* at ——, 115 S.Ct. at 1456.

In a dictum in *Plaut, id.* at ——, 115 S.Ct. at 1459, however, the court reaffirmed the continuing vitality of a case now over 140 years old, *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 18 How. 421, 15 L.Ed. 435 (1855). In that case, by a vote of 5 to 4, the Supreme Court upheld an act of Congress turning particular named bridges into postroads for the passage of the mails, thereby overriding a decree of the Court declaring one of the bridges to be an obstruction of free navigation and directing its removal. The bridge, the Court held, need not be destroyed because the new law created a new legal status for the bridge: by the act of Congress the bridge was "no longer an unlawful obstruction." 18 How. at 432.

A decision so old, decided by such a closely decided court, and invoked recently only by dicta, would not normally be thought to be dispositive of a constitutional issue, especially when the main sweep of the opinion which notices it is so explicit on the constitutional

impermissibility of congressional interference with the judicial branch. *See Plaut,* —— U.S. —— – ——, 115 S.Ct. at 1453–1456. *Wheeling Bridge,* moreover, could easily be distinguished from the present case: in *Wheeling,* Congress created a new fact changing the circumstances in which the injunction operated. What had been merely a nuisance on the river had been metamorphosed into a route for the mails, surely a transformation Congress could accomplish. Nothing of the sort has happened here. No new facts have been created. Congress simply has said that the Ninth Circuit has misinterpreted the law.

Nonetheless, it seems reasonable to suppose that, in the end, the reading of the rider proposed by the appellees will prevail: that is, the words of the rider will be interpreted as effecting an amendment of AICA with only prospective effect and that the distinction offered by *Wheeling Bridge* will permit the court to find the rider constitutional. When the purpose of Congress is clear and its power indisputable, the form of words that Congress uses should not be captiously or even closely scrutinized. *Stockdale v. Insurance Companies,* 87 U.S. (20 Wall.) 323, 332, 22 L.Ed. 348 (1873). The general principle that an injunction depends on circumstances and when circumstances change the injunction may change is unassailable. *United States v. Swift,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). The rider is the dispositive new circumstance. In practical effect it does not subvert an existing judgment of this court but creates a new situation in which an injunction against construction is no longer appropriate.

To reach this result will require a judicial gloss on the rider, a kind of operation in which what Congress had power to do is found to be what Congress did do, however open to criticism the language employed. To reach this result then involves the recognition that injunctions are not like final judgments for money damages and that altered circumstances sometimes make alterations in an injunction inevitable. That Congress itself by changing the law has the constitutional power to effect such change in circumstances is established. *System Federation v. Wright,* 364 U.S. 642, 649–650, 81 S.Ct. 368, 372–373, 5 L.Ed.2d 349 (1961) (citing and applying *Wheeling Bridge* ). Although in my mind it is a close question whether serious questions are presented by the appellants, in the end I am forced to conclude that there is almost no doubt that a conscientious court would give a benign prospective reading to the rider (ignoring its brief legislative history already cited) and hold that there is no question that Congress has the power to change the law so as to deprive an injunction of further effect. Reaching these conclusions, I concur in the order of the court.