**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CARL MERTON IRONS, II,
　　　　　　*Petitioner-Appellee,*

U.S. ATTORNEY GENERAL,
　　　　　　*Intervenor,*

　　　　　　v.

TOM L. CAREY, Warden,
　　　　　　*Respondent-Appellant.*

No. 05-15275

D.C. No.
CV-04-00220-LKK

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior District Judge, Presiding

Argued May 11, 2005
Submitted March 6, 2007
San Francisco, California

Filed March 6, 2007
Amended July 13, 2007

Before: Stephen Reinhardt, John T. Noonan, and
Ferdinand F. Fernandez, Circuit Judges.

Opinion by Judge Reinhardt;
Concurrence by Judge Noonan;
Concurrence by Judge Reinhardt;
Concurrence by Judge Fernandez

8335

**COUNSEL**

Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Stephen P. Acquisto, Supervising Deputy Attorney General, & Pamela B. Hooley, Deputy Attorney General, for the respondent-appellant.

Quin Denvir, Federal Defender, & Ann C. McClintock, Assistant Federal Defender, for the petitioner-appellee.

---

**ORDER**

The panel opinion, filed March 6, 2007, is hereby amended as follows:

1.  At page 2476 of the slip opinion, line 28, insert "At the time that Irons's state habeas petition was before the state courts," before "The Supreme Court."

2.  At page 2476 of the slip opinion, line 28, change "The" to "the."

3.  At page 2476 of the slip opinion, line 28, change "has" to "had."

Judge Noonan's concurring opinion is hereby amended as follows:

1.  At page 2483, line 23 of the slip opinion, delete "More."

2.  At page 2488, line 23 of the slip opinion, change "fundamentally" to "Fundamentally."

3.  At page 2488, line 22 of the slip opinion, insert the following new paragraph:

The great writ exists, by negative implication, in Article I of the Constitution of the United States. It was initially understood to extend only to prisoners in the custody of the United States. It was extended by statute in 1867 to embrace prisoners of a state in custody in violation of the Constitution of the United States. It may be that the right to federal review of a

claim of unconstitutional incarceration by a state is now to be considered an essential of due process just as the existence of federal courts to hear cases in numbers that it would be impossible for the Supreme Court to handle alone may be viewed as essential to due process. In each case, Congress exercising a power originally designed for application to the national government may lie under a constitutional obligation to exercise it more broadly for the preservation of the Constitution. In each instance, Congress would be called to enact a statute which is necessary. It is not, however, necessary to maintain that habeas corpus today is a requirement of due process. What is most relevant is that if Congress does provide for habeas in the federal courts, Congress cannot then instruct the federal courts, whether acting in a federal or in a state case, how to think, how to ascertain the law, how to judge.

With these amendments the panel has voted to deny the petition for rehearing. The petition for rehearing en banc is still pending.

---

## OPINION

REINHARDT, Circuit Judge:

The state appeals the district court's grant of habeas corpus to Carl Merton Irons II. The district court granted relief after finding that there was insufficient evidence in the record to support the California Board of Prison Term's decision to deem Irons ineligible for parole in 2001. In light of the California Supreme Court's decision in *In re Dannenberg,* 34 Cal. 4th 1061 (Cal. 2005), and our decision in *Sass v. California Board of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006), both decided after the district court issued its order in this case, we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1985, Irons was convicted of second degree murder in the death of his former housemate and sentenced to seventeen

years to life in prison. At the time of the offense, Irons was living in the home of a couple, with another tenant, John Nicholson. The couple suspected that Nicholson was dealing drugs and was stealing from them. Irons shared their suspicions. He confronted Nicholson and an angry argument ensued in which Nicholson denied responsibility for the thefts. Irons went to his room, retrieved his gun, and then went to Nicholson's room where he fired 12 rounds into Nicholson and, after Nicholson complained that he was in pain, stabbed him twice in the back. He then wrapped Nicholson's body in a sleeping bag and left it in the room for the ten days it took him to procure a car. Irons then took the body to the coast, weighed it down, and disposed of it in the ocean.

When the police found the body, their investigation led them to the house where Irons and the victim had lived. Forensic analysis showed that Nicholson had died on the premises, and the police decided to arrest the owner of the house. Irons intervened, explained to the police that they had the wrong person, and confessed to the killing. He was subsequently convicted of second degree murder and sentenced to seventeen years to life in prison with the possibility of parole. Prior to this conviction, Irons had no criminal record.

At the time of his 2001 parole hearing, Irons had been incarcerated for sixteen years. Throughout his confinement, his conduct has been exemplary. From 1988 to the present he has maintained "Medium A" custody status, indicating that prison officials see him as a low threat. He has not engaged in further acts of violence, nor has he received any C.D.C. 128A written disciplinary charges.

Irons suffers no mental health problems, and has received positive evaluations from the psychologists and counselors who have examined and treated him. He has been extremely industrious while in prison, maintaining average to exceptional job performance in every position he has occupied. He has also received certificates of completion in several voca-

tional training programs, and has participated in numerous self-help, substance abuse treatment, violence prevention and stress management programs. Even members of the Board have commented that Irons has "programmed in an exemplary manner in all areas."

Irons also has solid plans for the future. He will live with his mother when he is released and he has a standing job offer from a friend who owns a video production business. He also has the support of Deputy District Attorney Stephen Wagstaffe, the prosecutor assigned to Irons' case from the outset.

These facts notwithstanding, the Board determined that Irons was unsuitable for parole in 1994, 1996, 1998, 1999, and 2001.[1] The Board's decision in 2001, the decision at issue in this case, was based on three factors. "First and foremost was the commitment offense itself." The Board found that Irons' crime was "carried out in an especially cruel and callous manner." It further noted his motivation for the killing was trivial and that Irons was using drugs around the time of the offense. Second, the Board stated that Irons "needs therapy" and recommended "continued participation in self-help programming." Finally, the presiding commissioner stated, "I think you were asked by your counsel whether a situation like this would happen again, whether you would kill somebody. And I think you said, I don't think so . . . [T]hat's not a very convincing reply."

After filing an unsuccessful administrative appeal challenging the Board's decision, Irons filed a state habeas petition in Marin County Superior Court alleging that the Board's 2001 unsuitability determination violated his due process rights. The Superior Court denied the petition, finding that the

---

[1]The record also shows that he was deemed unsuitable for parole in 2002, 2003, and 2004. We, of course, express no view as to the constitutionality of these denials or the applicability of the warning set forth in *Biggs v. Terhune,* 334 F.3d 910 (9th Cir. 2003). *See* pp. 8347-48, *infra.*

Board's decision was supported by "some evidence" and thus did not violate due process. Irons appealed, and the California Court of Appeal and the California Supreme Court issued summary denials.

He then filed a petition for writ of habeas corpus in federal district court, and in January of 2005 the district court adopted the magistrate judge's findings and recommendations granting the petition. The district court concluded that the state court unreasonably applied clearly established Supreme Court precedent because the board's decision was without evidentiary support, and further held that the Board's continued reliance on Irons' commitment offense and prior conduct to deem him unsuitable for parole violated Irons' right to due process.

On appeal, the state argues that the district court erred in concluding that the Board's 2001 decision was not supported by "some evidence," and that the district court failed to afford the California state court decision upholding the Board's unsuitability determination the proper degree of deference required under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

## STANDARD OF REVIEW

We review the district court's decision to grant Irons' petition for habeas corpus de novo. *Leavitt v. Arave*, 371 F.3d 663, 668 (9th Cir. 2004). Because Irons filed his petition after the effective date of AEDPA, his petition for habeas corpus may be granted only if he demonstrates that the state court decision denying relief was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## DISCUSSION

**[1]** California Penal Code section 3041 vests Irons and all other California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause. *Sass,* 461 F.3d at 1128; *Biggs,* 334 F.3d at 914; *McQuillion v. Duncan,* 306 F.3d 895, 903 (9th Cir. 2002); *see also Bd. of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987) (quoting *Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 12 (1979)). At the time that Irons's state habeas petition was before the state courts, the Supreme Court had clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," *Sass,* 461 F.3d at 1128-29 (citing *Superintendent v. Hill,* 472 U.S. 445, 457 (1985)); *see also Biggs*, 334 F.3d at 915 (citing *McQuillion,* 306 F.3d at 904), or is "otherwise arbitrary," *Hill,* 472 U.S. at 457.[2] When we assess whether a state parole board's suitability determination was supported by "some evidence" in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. *See Biggs,* 334 F.3d at 915. Accordingly, here we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" in Irons' case constituted an unreasonable application of the "some evidence" principle articulated in *Hill*, 472 U.S. at 454.

**[2]** Under California law, prisoners serving an indeterminate sentence for second degree murder "may serve up to life in prison, but [ ] become eligible for parole consideration after

---

[2] We need not address whether the Board's determination was "otherwise arbitrary" because that question is not implicated here.

serving minimum terms of confinement." *Dannenberg,* 34 Cal. 4th at 1078. Although the Board must "normally set a parole release date" before the minimum term has been served, *id.,* an inmate " 'shall be found unsuitable for parole and denied parole if, in the judgment of the [Board,] the prisoner will pose an unreasonable risk of danger to society if released from prison,' " *id.* at 1080 (quoting Cal. Code Regs., tit. 15 § 2402(a)).[3]

**[3]** The Board must determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the "circumstances tending to show unsuitability" and the "circumstances tending to show suitability" set forth in Cal. Code. Regs., tit. 15 § 2402(c)-(d).[4] A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for

---

[3]Specifically, under California Penal Code section 3041(a), "one year before the prisoner's minimum eligible parole date, a Board panel shall meet with the inmate, 'shall normally set a parole release date,' and shall do so 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public.' " *Dannenberg*, 34 Cal. 4th at 1078. However, a "determination of an individual inmate's *suitability* for parole under *section 3041, subdivision (b)* must precede any effort to set a parole release date under the uniform-term principles of *section 3041, subdivision (a). Id.* at 1079-80.

[4]Under these regulations, the circumstances tending to show that a prisoner is unsuitable include: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner"; (2) the prisoner's previous record of violence; (3) "a history of unstable or tumultuous relationships with others"; (4) commission of "sadistic sexual offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." Cal. Code. Regs., tit. 15 § 2402(c). Circumstances tending to show that a prisoner is suitable for parole include: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; . . . (6) the prisoner lacks any significant history of violent crime; . . . (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Cal. Code. Regs., tit. 15 § 2402(d).

parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released. *Dannenberg,* 34 Cal. 4th at 1071. Factors beyond the minimum elements of the crime include, *inter alia*, that "[t]he offense was carried out in a dispassionate and calculated manner," that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal. Code. Regs., tit. 15 § 2402(c)(1)(B), (D)-(E).

Here, the Board based its 2001 determination that Irons was unsuitable for parole "first and foremost" on the fact that "[t]he offense was carried out in an especially cruel and callous manner . . . which demonstrates a callous disregard for human life." It also noted that "the motive for this crime was trivial in relation to the offense." Although we agree with the district court that the other bases for the Board's unsuitability determination — that Irons "needs therapy" and that when asked whether he would kill again said, "I don't think so" — were wholly unsupported by "some evidence," in light of *Dannenberg* and *Sass* we are unable to conclude that the Board's findings regarding the nature of the commitment offense were without some evidentiary support.

In *Dannenberg* the California Supreme Court addressed a prisoner's challenge to the parole Board's decision to deem him unsuitable for parole on the basis of his commitment offense in spite of the fact that virtually all other relevant factors militated in favor of a finding of suitability. Dannenberg had been sentenced to 15 years to life in prison for the second degree murder of his wife in 1985. After a domestic argument, Dannenberg struck multiple blows to his wife's head with a pipe wrench and then pushed her into a tub of water in which she drowned. 34 Cal. 4th at 1095. At his 1999 parole

hearing the Board concluded that Dannenberg presented a danger to society if released and was thus unsuitable for parole because the second degree murder he committed was " 'especially callous and cruel,' showed 'an exceptionally callous disregard for human suffering,' and was disproportionate to the 'trivial' provocation" for the offense. 34 Cal. 4th at 1095. The California Supreme Court held that the Board's decision to deem Dannenberg unsuitable on this basis was supported by "some evidence" because the Board "pointed to circumstances of the inmate's offense suggesting viciousness beyond the minimum elements of second degree murder . . . . Accordingly, [ ] the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, for reasons of public safety, to receive a firm parole released date." *Id.*

**[4]** Because we find that Irons' crime was similarly cruel or vicious, we cannot say that there was not "some evidence" to support the Board's determination that Irons was unsuitable for parole under California law. Specifically, given that his commitment offense, standing alone, is a sufficient basis for deeming a petitioner unsuitable where, as here, there is some evidence to support a finding that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" and the "motive for the crime is inexplicable or very trivial in relation to the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we cannot say that the state court unreasonably applied *Hill*'s "some evidence" principle.

Irons argues that, even if there is "some evidence" to support a finding that he is unsuitable for parole under the applicable California regulations, the Board's reliance on an immutable factor to deny him parole, namely his commitment offense, nonetheless violated due process. In support of this argument, he cites our decision in *Biggs,* 334 F.3d 910. In *Biggs*, we affirmed the district court's denial of a prisoner's petition for habeas corpus challenging the Board's determination that he was unsuitable for parole on the basis of his com-

mitment offense. 334 F.3d at 916. Although we held that the Board's decision was supported by "some evidence" because "[t]he murder of which Biggs was convicted involved killing a witness in a manner which exhibited callous disregard for life," we made clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Id.* at 916-17. Specifically, we held that a

> parole board's sole . . . reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

*Id.* at 916.

Subsequently, in *Sass*, we held that denying parole to an individual in reliance on his offense of commitment did not violate due process. 461 F.3d at 1129. Although we acknowledged that *Biggs* represents the law of this circuit and specifically noted that "continued reliance . . . [on] the offense and on conduct prior to imprisonment . . . could result in a due process violation,' " *id.*, we nonetheless held that the Board's reliance on the "gravity" of the second degree murder of which Sass was convicted, in combination with prior incidents of unlawful conduct, provided a sufficient basis for the Board to deem Sass unsuitable for parole. Because the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of reha-

bilitation, our decision in *Sass* precludes us from accepting Iron's due process argument or otherwise affirming the district court's grant of relief.

[5] We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in *Biggs*, *Sass*, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. *Biggs*, 334 F.3d at 912; *Sass*, 461 F.3d 1125. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

Furthermore, we note that in *Sass* and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes. *Biggs*, 334 F.3d at 917.[5]

---

[5]Although we requested and received briefing on the constitutionality of the provision of AEDPA that directs federal courts to grant habeas relief to state petitioners only when the state court decision denying relief was "contrary to, or involved an unreasonable application, of clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. 2254(d)(1), we are now persuaded that *Duhaime v.*

The district court's order granting Irons' petition for habeas corpus is REVERSED.

---

NOONAN, Circuit Judge, concurring:

Proper resolution of this case, on its face involving the fate of a single individual, involves the clash of two constitutional principles of importance to every inhabitant of our country:

Congress has the power to determine the jurisdiction of all federal courts.

Congress does not have the power to determine how a federal court shall decide a case.

An easy solution of the clash is to say that the greater power includes the lesser. If Congress can determine jurisdiction and so take away any judicial supervision of the subject, a fortiori Congress can specify what materials the courts may use in deciding the case. This reasoning is of a mathematical character. It has the precision and the force of Euclidean geometry. In addition, it has a pragmatic appeal. Why force Congress to use its radical power to remove jurisdiction, if the purposes of Congress will be served by Congress directing the process of decision?

This line of argument has an undoubted appeal. It is nonetheless mistaken. Euclidean logic does not dominate a judge's careful consideration of all the aspects of matters that are far from linear. A simple example: The power to kill is greater

---

*Ducharme*, 200 F.3d 597 (9th Cir. 2000), answers that question, correctly or not, for the court. A three-judge panel of this court is without authority to overrule a holding of an earlier panel. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc). Only an en banc court has the authority to do so. *Id.*

than the power to torture. The state may kill individuals. It may not torture them. The pragmatic argument that Congress could remove all jurisdiction may be met pragmatically: the people would not put up with legislative abolition of such sweeping character, any more than the people would say, "If you can't torture them, kill them."

The great writ exists, by negative implication, in Article I of the Constitution of the United States. It was initially understood to extend only to prisoners in the custody of the United States. It was extended by statute in 1867 to embrace prisoners of a state in custody in violation of the Constitution of the United States. It may be that the right to federal review of a claim of unconstitutional incarceration by a state is now to be considered an essential of due process just as the existence of federal courts to hear cases in numbers that it would be impossible for the Supreme Court to handle alone may be viewed as essential to due process. In each case, Congress exercising a power originally designed for application to the national government may lie under a constitutional obligation to exercise it more broadly for the preservation of the Constitution. In each instance, Congress would be called to enact a statute which is necessary. It is not, however, necessary to maintain that habeas corpus today is a requirement of due process. What is most relevant is that if Congress does provide for habeas in the federal courts, Congress cannot then instruct the federal courts, whether acting in a federal or in a state case, how to think, how to ascertain the law, how to judge.

Fundamentally, the Euclidean line of argumentation advanced above is based on a profound misunderstanding of the judicial power and the role that judges, uncontrolled in their reasoning by the legislature, perform to make it work. Legislatures exist to make laws. Courts exist to decide cases. The separation of these functions is part of our democratic system of government. To allow the legislature to decide a case is to deny the separation. To allow the legislature to tell a court how a case should be decided is worse. It allows the

legislature to mask itself under judicial robes. It puts forward as the judgment of a court what in actuality is the judgment of the legislature. Impermissibly it mixes the two branches. It does so to the great detriment of the judicial branch which is made to act as if it were performing its judicial task while it has had its ability to perform this task removed.

It may be said that Congress has the power to approve or disapprove the Federal Rules of Procedure, and these rules play a part in the decision of a case. It may be further argued that Congress can determine the number of judges, where they shall sit, how many assistants they may have, and what appeals may be taken, and that all these determinations have an impact on how a particular case will be decided.

True as these observations are, they do not go to the heart of the matter. The number, venue, and assistance given the judges point to no particular outcome in the decision of a case, nor does the path provided for appeal. The Federal Rules, formulated by judges, operate impartially in all cases. They preordain a decision in none. Even more importantly, they do not determine the law the judges must apply.

Congress can enact legislation with an effect on the future of litigation in a particular case, e.g. by removing the statutory ground for an injunction restricting future conduct. *Mount Graham Coalition v. Thomas*, 89 F.3d 554 (9th Cir. 1996). Congressional alteration of a statute bearing on future conduct does not usurp the judicial function.

AEDPA specifies that an application for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d).

Concurring in *Williams v. Taylor*, 520 U.S. 362, 412 (2000), Justice O'Connor glossed "clearly established" to mean a holding by the Supreme Court, not a dictum. Justice O'Connor's concurrence was adopted by a majority of the Court. Her gloss on "clearly established" was itself dictum because it was not necessary to the decision of the case. *Williams*, 529 U.S. at 413 (O'Connor, J., concurring). It is a dictum that has banished dicta from the grounds for granting habeas corpus. It is a dictum necessarily narrowing the normal way in which decisions of the highest court are read and applied.

AEDPA does operate over the whole class of cases of habeas corpus. It does not require a result in any particular case. What it does do is to strike at the center of the judge's process of reasoning. It shuts the judge off from the judge's normal sources of law and curbs that use of analogy which is the way the mind of a judge works. In our system of law where precedent prevails and is developed, AEDPA denies the judge the use of circuit precedent, denies development of Supreme Court and circuit precedent, denies the deference due the penumbra and emanations of precedent, and even denies the courts the power to follow the law as now determined by the Supreme Court — the precedent to be applied must have been in existence at the earlier moment when a state decision occurred. A more blinkered concept of law cannot be imagined — law, particularly constitutional law — is treated as what once was the law. The development of doctrine is despised. That despisal is a direct legislative interference in the independence of the judiciary.

It could be said that the ban on using Supreme Court decisions issued later than the relevant state court determination is a ban on the retroactivity of such decisions; and the Supreme Court has more than once announced constitutional decisions that are good for the future but cannot be read back into the past. *See, e.g., Linkletter v. Walker*, 381 U.S. 618 (1965). True as that is, for the Supreme Court to choose not

to make its decisions retroactive is not the same as Congress choosing to do it. The latter action is an interference with a prerogative that goes with wise judging. Whether to judge only for the future is for the judge to decide.

It might equally be asserted that the exclusion of a circuit court's precedents from consideration by the circuit is simply a limitation on the jurisdiction of circuit courts. So it might be said, but far from accurately. AEDPA does not address jurisdiction: it addresses the materials for judging. It deprives a whole class of cases of their normal value as governing authority for the circuit which has decided them.

Federal judges have taken an oath to uphold the Constitution of the United States. That oath has always been understood to mean the Constitution as it is interpreted by the courts. It is, of course, a grade school fiction that the Constitution does not change. It changes constantly: by constitutional amendment, by decisions of the Supreme Court, and by the invention of such things as the airplane, automobile, and internet. For a judge to be frustrated in following the most recent decision of the Supreme Court is perilously close to forcing the judge to violate his oath to uphold the Constitution as it presently is understood.

Sometimes a lawyer or even a judge will say, If this rule is upheld, you can expect even worse to follow — a variant of the biblical expression, "If that is what they do in the green wood, what will they do in the dry?" It is unnecessary to engage in such speculation as to AEDPA. It already appears to accomplish a sizeable shrinkage of judicial independence.

Can the constitutionality of AEDPA be sustained? Our circuit has so ruled. *Duhaime v. DuCharme*, 200 F.3d 597, 601 (9th Cir. 1999). I am bound by this decision. Moreover, the Supreme Court has upheld the application of AEDPA in a multitude of cases, tacitly assuming its constitutionality. Yet if I cannot depart from the law of the circuit, I may still ask

the question as to constitutionality in the light of governing decisions by the Supreme Court.

As every law school student knows, *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137 (1803), held unconstitutional an Act of Congress that attempted to confer jurisdiction on the Supreme Court. Writing for the unanimous court, Chief Justice Marshall declared:

> The judicial power of the United States is extended to all cases arising under the constitution.
>
> Could it be the intention of those who gave this power, to say that, in using it, the constitution should not be looked into? That a case arising under the constitution should be decided without examining the instrument under which it arises?
>
> This is too extravagant to be maintained.
>
> In some cases then, the constitution must be looked into by the judges. And if they can open it at all, what part of it are they forbidden to read, or to obey?
>
> . . . .
>
> Why does a judge swear to discharge his duties agreeably to the constitution of the United States, if that constitution forms no rule for his government? if it is closed upon him, and cannot be inspected by him?
>
> If such be the real state of things, this is worse than solemn mockery. To prescribe, or to take this oath, becomes equally a crime.

*Marbury,* 5 U.S. at 178-80.

These general and fundamental propositions were established near the beginning of our country. They were set out in a case involving congressional meddling with the constitution's limitations on jurisdiction. They unarguably govern congressional efforts to prescribe how a court shall decide a case.

In a case foundational in vindicating the power of the Supreme Court to review and reverse the judgment of the highest court of a State, large though this impairment is of the sovereignty of the State, Justice Story wrote:

> If, then, it is a duty of congress to vest the judicial power of the United States, it is a duty to vest the whole judicial power. The language, if imperative as to one part, is imperative as to all. If it were otherwise, this anomaly would exist, that congress might successively refuse to vest the jurisdiction in any one class of cases enumerated in the constitution, and thereby defeat the jurisdiction as to all; for the constitution has not singled out any class on which congress are bound to act in preference to others.
>
> . . . .
>
> [E]ven admitting that the language of the constitution is not mandatory, and that congress may constitutionally omit to vest the judicial power in courts of the United States, it cannot be denied that when it is vested, it may be exercised to the utmost constitutional extent.

*Martin v. Hunter's Lessee*, 14 U.S. 304, 330, 337 (1816).

In legislation reflecting the passions of the Civil War, Congress passed a law repudiating the Supreme Court's interpretation of a statute governing the return to its owner of property seized by Union forces during the war. The Supreme

Court treated the attempt to curtail its jurisdiction as an attempt to control its decisions:

> The court is required to ascertain the existence of certain facts and thereupon to declare that its jurisdiction on appeal has ceased, by dismissing the bill. What is this but to prescribe a rule for the decision of a cause in a particular way? . . . We are directed to dismiss the appeal, if we find that the judgment must be affirmed, because of a pardon granted to the intestate of the claimants. Can we do so without allowing one party to the controversy to decide it in its own favor? Can we do so without allowing that the legislature may prescribe rules of decision to the Judicial Department of the government in cases pending before it?
>
> We think not . . . .

*United States v. Klein,* 80 U.S. 128, 146 (1872).

As recently as 1995, the Supreme Court held that a section of the Securities Exchange Act, retroactively directing federal courts to reopen final federal judgments, was invalid:

> Congress has exceeded its authority by requiring the federal courts to exercise "the judicial power of the United States," U.S. Const., Art. III, § 1, in a manner repugnant to the text, structure, and traditions of Article III.
>
> . . . .
>
> . . . Article III establishes a "judicial department" with the "province and duty . . . to say what the law is" in particular cases and controversies. *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 177, 2 L. Ed. 60 (1803). The record of history shows that the Framers

crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy — with an understanding, in short, that "a judgment conclusively resolves the case" because "a 'judicial Power' is one to render dispositive judgments." Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905, 926 (1990).

*Plaut v. Spendthrift Farm,* 514 U.S. 211, 217-219 (1995) (emphasis in original).

Almost two centuries after *Marbury*, Chief Justice Marshall's reasoning was once more applied to invalidate an Act of Congress that determined what acts violated the religious freedom guaranteed by the First Amendment. Congress had undertaken to enlarge the scope of this freedom beyond the limits set by the Supreme Court. This legislative effort was rebuffed:

> The power to interpret the Constitution in a case or controversy remains in the Judiciary.
>
> . . . .
>
> If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be "superior paramount law, unchangeable by ordinary means." It would be "on a level with ordinary legislative acts, and, like other acts, . . . alterable when the legislature shall please to alter it." *Marbury v. Madison*, 1 Cranch at 177. Under this approach, it is difficult to conceive of a principle that would limit congressional power. See Van Alstyne, *The Failure of the Religious Freedom Restoration Act under Section 5 of the Fourteenth*

*Amendment*, 46 Duke L. J. 291, 292-303 (1996). Shifting legislative majorities could change the Constitution and effectively circumvent the difficult and detailed amendment process contained in Article V.

. . . .

Our national experience teaches that the Constitution is preserved best when each part of the government respects both the Constitution and the proper actions and determinations of the other branches. When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. *Marbury v. Madison*, 1 Cranch at 177.

*City of Boerne v. Flores*, 521 U.S. 507, 524, 529, 535-36 (1997).

With these precedents before my eyes, whatever doubts they raise, whatever answer they suggest, I am bound by controlling case law and so concur.

---

REINHARDT, Circuit Judge, concurring specially:

I fully join in Judge Noonan's sagacious concurrence. Would that it were the law of the land. I add only a couple of thoughts.

After affording federal courts the power to issue writs of habeas corpus in state cases, Congress tells us in AEDPA that we may not grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist. Whether it was reasonable for a state court to misappre-

hend the dictates of the Constitution in a particular case hardly seems relevant to a citizen's right not to be imprisoned in violation of the fundamental liberties he is granted by the document that governs our societal structure. Nor is authorizing jurists to determine that a citizen's detention is unlawful, but that he must remain incarcerated because a magistrate's error is understandable, consistent with our duty as jurists to enforce the laws and protect the rights of our citizens against arbitrary state action.

Having granted the courts the authority to review state convictions under our habeas powers, it seems to me inconsistent with our fundamental obligations as judges to require us, except in unusual or exceptional circumstances, to rule for the state regardless of whether it violated the Constitution. Such a mandate appears to me to tell us how to decide a case. That, for the reasons Judge Noonan so well expresses, Congress simply may not do.

---

FERNANDEZ, Circuit Judge, concurring:

I concur in Judge Reinhardt's opinion. I write separately for two reasons.

First, I am not satisfied that there was no reason to continue to hold Irons in prison other than the circumstances of his callously senseless murder of another person for trivial reasons. While his answer to whether he still had the rage that led him to kill someone[1] can easily be read in an innocuous manner,

---

[1]The testimony went this way, in part:

> Attorney Schmidt [Irons' attorney]: You gave the impression, in response to one of the questions, almost that if it wasn't Mr. Nicholson [the victim], that it might have been somebody else
> . . . .

it need not be, and the Commission could interpret it to mean that he might. At any rate, I see nothing wrong with being very, very cautious about releasing a person from prison and onto society when he has committed the kind of crime that Irons committed and has done it as flagitiously as he did it. The Board has a right (nay, an obligation) to be exceedingly cautious about setting him free.

Second, Judge Noonan has issued a concurring opinion in which he decries the fact that we (and, probably, the United States Supreme Court) have deemed the AEDPA to be constitutional. I do not join that, and its mere filing would elicit no response from me but for the fact that Judge Reinhardt has concurred in the concurrence. Because that means that two members of the panel have joined that opinion, it might be seen to indicate that the panel is speaking for the court and that the court is, therefore, attacking itself. It might be thought that we have found a new way to create an umbrageous, or stealth, conflict in our jurisprudence, which district courts and attorneys had better take into account. That, I know, is not the intention of my colleagues, who have carefully crafted the concurring opinion to indicate that, at least at this point, they merely wish to express their strongly-held views about the

---

Inmate Irons: Looking back on it, after the fact, I — now, I guess that those two questions relate to each other. Looking back, I realize that I was responsible. And in that sense, it could have been somebody else. I mean, I don't mean I was going to kill somebody at random, but the circumstances — some set of circumstances that led me to that rage, I was primed for it. I was — I had let myself become that person who could kill and it could have been somebody else . . . .

Attorney Schmidt: Do you have any of that rage now?

Inmate Irons: I don't think so. I try to make a real effort to examine my motives, to look inside of myself . . . . I — I think I've dealt with most of these issues. If they arise in some other way, I'll look for the appropriate help.

strictures of the AEDPA, without creating a conflict in the law of this circuit.

Thus, I respectfully concur in Judge Reinhardt's opinion only.