Glenn L. BOYD, Jr., aka Glenn Leslie Boyd, Jr., Petitioner,

v.

Victor M. ALMAGER, Warden (A), Respondent.

Case No. ED CV 07–1651–RSWL(RC).

United States District Court, C.D. California.

Dec. 9, 2009.

Glenn Boyd, Imperial, CA, pro se.

Linnea Daya Piazza, Office of Attorney General, San Diego, CA, for Respondent.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

RONALD S.W. LEW, Senior District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, as well as petitioner's objections, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the petition and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on petitioner.

## REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

ROSALYN M. CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Ronald S.W. Lew, Senior United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On June 14, 1988, in San Bernardino County Superior Court case no. SCR45508, a jury convicted petitioner Glenn Boyd, aka Glenn Leslie Boyd, Jr., of first degree murder in violation of California Penal Code ("P.C.") § 187(a) (count 1) and second degree robbery in violation of P.C. § 211 (count 2);[1] however, the jury found

---

**1.** The California Court of Appeal set forth the pertinent facts underlying petitioner's crimes in *People v. Boyd*, 222 Cal.App.3d 541, 271 Cal.Rptr. 738 (1990), as follows:

not true the special circumstance allegation that petitioner committed the murder during the commission of a robbery within the meaning of P.C. § 190.2(a)(17) and the firearm allegation that petitioner personally used a firearm within the meaning of P.C. §§ 1203.06(a) (1)/12022.5. *Boyd,* 222 Cal.App.3d at 548, 271 Cal.Rptr. 738; Lodgment nos. 1–2. The trial court sentenced petitioner to prison for a term of 25 years to life on count 1 and a concurrent five-year term on count 2. Lodgment nos. 1–2.

The petitioner appealed his convictions and sentence to the California Court of Appeal, which affirmed the judgment in a reported opinion filed July 25, 1999. *Boyd,* 222 Cal.App.3d at 556–77, 271 Cal. Rptr. 738. On August 4, 1990, petitioner filed a petition for review in the California Supreme Court, which denied the petition on October 30, 1990; however, Justice Mosk was of the opinion the petition

should be granted. *People v. Boyd,* California Supreme Court case no. S017253.

## II

On August 15, 2006, petitioner had his second parole suitability hearing, Lodgment no. 3, at which time a panel of the California Board of Parole Hearings ("Board") denied petitioner parole for three years, finding he is "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." Lodgment no. 3 at 86. In reaching its decision, the Board made the following findings:

> ██ [T]he offense was carried out in an especially cruel and callous manner. This wasn't a rival—anyone who had hurt [petitioner]. This young man was trying to put himself through college delivering pizza. Umm, so there was planning involved. The pizza man was—you knew the pizza man was com-

On September 9, 1987, at about 12:50 a.m., Kenneth Burley, a driver for Domino's Pizza in San Bernardino, left to deliver a pizza to an apartment at 2004 McKinley Street in San Bernardino. Kurtis Hobel was sitting on the lawn [in] front of his family's apartment at the corner of 20th Street and McKinley talking to Lisa Lopez. Kurtis Hobel's sister, Hope Hobel, was also there with a friend, Kelly Evans. The moon was almost full, the sky was clear, and street lights were on. Kurtis Hobel saw a blue pickup truck park at an angle on the left side of McKinley. Burley, wearing a Domino's Pizza shirt and matching baseball cap, got out of the truck. Burley left the truck's headlights on and walked toward an apartment complex. Two men, whom Kurtis Hobel later identified as [petitioner] and Thomas, approached Burley, who stood with his back to Kurtis Hobel. [Petitioner] stood on Burley's left and Thomas on Burley's right, facing Burley. [Petitioner] held a clear bottle and took a drink from it. [¶] Kurtis Hobel heard the words, "Give me," and "Money." He then heard, "I don't have any." Burley put his hands in his

front pants' pockets, pulled them out and raised them palms up. Kurtis Hobel did not see Burley give [petitioner] and Thomas anything, but he heard something like, "Is that all." Burley simultaneously tapped his rear pants' pockets with his hands. [Petitioner] then struck Burley in the face with his right hand and Thomas kicked Burley between the legs. When Burley bent forward and grabbed his groin, [petitioner] raised his right hand. Kurtis Hobel saw a flash on Burley's left and heard a gunshot, but did not see a gun. Burley fell to the ground. [Petitioner] and Thomas went north on McKinley. Kurtis Hobel heard a car door shut and saw a white Chevrolet Blazer which had been parked on McKinley drive away. He did not see anyone in the Blazer, but told the police that [petitioner] and Thomas could have been inside. [¶] Burley died almost instantly from a gunshot wound to the heart. The wound was caused by a bullet which could have been anything from .30– to .44–caliber.

*Boyd,* 222 Cal.App.3d at 548–56, 271 Cal. Rptr. 738 (footnote omitted).

ing, so there was, you know, you waited for him. The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. This man presented no threat whatsoever. The robbery had taken place. You had taken his pizza. You had taken his money. He was already bent over from just a—a punch and a kick. He was basically defenseless and there was no need to go further and take this man's life. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. There was great violence, viciousness, and a high degree of cruelty involved in this crime. The motive for the crime was very trivial in relation to the offense. I—it's trivia is the word, because, according to your own testimony, you already had money. This man only had a few dollars so if that was the case, and he wasn't even putting up any fight. Looks like you two jumped him and that was the end of it. That could—you could've just walked away with the pizza and he probably would've just got in his place and—and at least left with his life. And you would've had his money and his pizza. Uh, so that was a very trivial reason. [2] And another troubling thing about this whole situation to me is, uh, (inaudible) involving a lack of insight. [Petitioner] ha[s]n't shown any, uh, remorse, as far as I'm concerned. I mean, no responsibility whatsoever ... taken for anything that happened. [3] Uh, the [petitioner] has an unstable social history which includes, you know, [petitioner] hanging around, I'm not saying [petitioner was] gang-affiliated, but hanging around with gangsters and the type of people selling drugs, running a drug house. I mean that puts it on a whole []other level. I mean [petitioner] had actually [been] promoted from just being a street-level drug dealer to ... running a house and [petitioner had] people working for [him]. [4] And the psychological report dated in 4/6/2006, authored by Bob Ohrling, Ph.D.; uh, he says that within the community [petitioner] would be no greater risk of danger than the average citizen, and, uh, personally, I disagree with that because I think it's inconclusive because before that it states, even the part [petitioner] admit[s] to in the report states that [petitioner's] friend had requested [petitioner] ... leave a gun for him and [petitioner] threw the gun in the bushes[;] and so it's like this report didn't cover any type of insight, any kind of remorse on [petitioner's] part. Uh, it just—so, I consider that part inconclusive. [5] Uh, the prisoner lacks realistic parole plans in that he does not have acceptable employment plans. We need up-to-date letters, sir. And, nevertheless, [petitioner] should be commended for the good things [petitioner] ha[s] accomplished while [he's] been incarcerated. Uh, ...—[he's] managed to, uh, get [his] GED, and [he's] managed to get a—[his] A.A. degree with a 3.5 GPA. That's very good. And [he's] planning to go on and get [his] B.A. Umm, [petitioner's] had exceptional work reviews. Umm, and [he's]—[he's] got three vocations already[:] Carpentry, Plumbing and Office Service Tech. Uh, self-help, I think [petitioner's] got, uh, a ton of AA extensively—AA, NA, uh, [he's] attended anger management, uh, bible studies. Uh, [he's] got tons of chronos, positive chronos. Uh, so, [he's], uh,—[he's] gotten eight 128As, and the last one òf those was in 6/13/1989; that was for out of bounds. [Petitioner's] gotten three 115s, the last one of those was 6/1/95, disobeying orders. Uh, so, [petitioner] look[s] like [he's] been keeping [his] nose clean for the last 11 years. Uh, so—but nevertheless, these positive as-

pects of [petitioner's] behavior do[ ] not outweigh the factors of unsuitability. In a separate decision, the hearing panel finds that it is not reasonable to expect that parole would be granted at a hearing during the following three years. So, this is a three-year denial. Uh, it's for the reasons I've previously stated. Uh, I think this crime was very cruel. Uh, it's—it was—the crime was done, and planned without feeling bad about hurting others. There was plenty [of] opportunity to get out of this situation, but this man lost his life senselessly. So this was a senseless killing, and the—the victim was extremely vulnerable in that he wasn't even attacking [petitioner] or anything. He was already doubled over and knocked to the ground. Uh, 'til—the inmate did not care if people suffered. So this man was just shot for dead and left. [Petitioner] went away. Uh, and the reason for the crime was very small compared to the hurt it caused. These people, his family, friends, people he'd known, their whole life has been shattered by this. They can't write letters to him or watch his family grow up, so this man—there was a great degree of harm caused in this crime because this man's life was taken needlessly. With that, that's going to conclude the, uh, reading of the decision. . . .

Lodgment no. 3 at 86–90.

On or about February 21, 2007, petitioner filed a habeas corpus petition in the San Bernardino County Superior Court challenging the Board's decision, Lodgment no. 8, and on March 6, 2007, the Superior Court denied the petition, stating:

Was the board justified by the evidence in denying parole? Certainly it was. [¶] The circumstances of Petitioner's murder of a defenseless pizza delivery man are heinous in the extreme. He and his fellow murderer beat up and shot to death a man for no money. Despite any "good conduct" Petitioner has displayed while in prison, the prison board was fully justified in deciding that a person who would commit such a crime does not belong in the company of ordinary citizens who[m] he might prey upon in the future.

Lodgment no. 9 at 2. On or about April 3, 2007, petitioner filed a habeas corpus petition in the California Court of Appeal, which denied the petition on April 12, 2007. Lodgment nos. 10–11. Finally, on April 30, 2007, petitioner filed a habeas corpus petition in the California Supreme Court, which denied the petition on November 14, 2007. Lodgment nos. 12–13.

### III

On December 14, 2007, petitioner filed the pending petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging the Board's decision finding him unsuitable for parole, raising the sole claim that the Board violated his "right to due process by repeatedly basing a parole denial on the unchanging factors of petitioner's crime and other preprison factors." Petition at 5. On February 15, 2008, respondent filed an answer to the petition, and on April 14, 2008, petitioner filed his reply.

### DISCUSSION

### IV

■ The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "circumscribes a federal habeas court's review of a state court decision." *Lockyer v. Andrade,* 538 U.S. 63, 70, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003). As amended by AEDPA, 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim[¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, under AEDPA, a federal court shall presume a state court's determination of factual issues is correct, and petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

■■■ The California Supreme Court reached the merits of petitioner's claim when it denied his habeas corpus petition without comment or citation to authority. *Gaston v. Palmer,* 417 F.3d 1030, 1038 (9th Cir.2005), *amended by,* 447 F.3d 1165 (9th Cir.2006), *cert. denied,* 549 U.S. 1134, 127 S.Ct. 979, 166 L.Ed.2d 742 (2007); *Hunter v. Aispuro,* 982 F.2d 344, 348 (9th Cir. 1992), *cert. denied,* 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 2594, 115

L.Ed.2d 706 (1991); *Medley v. Runnels,* 506 F.3d 857, 862 (9th Cir.2007) (en banc), *cert. denied,* —— U.S. ——, 128 S.Ct. 1878, 170 L.Ed.2d 754 (2008). Thus, in addressing petitioner's claim, this Court will consider the reasoning of the San Bernardino County Superior Court, which denied the claim on the merits. *Stenson v. Lambert,* 504 F.3d 873, 884 (9th Cir.2007), *cert. denied,* —— U.S. ——, 129 S.Ct. 247, 172 L.Ed.2d 188 (2008); *Fowler v. Sacramento County Sheriff's Dep't,* 421 F.3d 1027, 1038 (9th Cir.2005).

## V

■■■ The Fourteenth Amendment's due process clause provides that a person may not be deprived of life, liberty, or property without due process of law. The Supreme Court "examine[s] procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, . . .; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (citations omitted); *Sass v. Cal. Bd. of Prison Terms,* 461 F.3d 1123, 1127 (9th Cir.2006). "Under the 'clearly established' framework of *Greenholtz* [2] and *Allen,* [3] . . . California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion v. Duncan,* 306 F.3d 895, 902 (9th Cir.2002) (footnotes added); *Sass,* 461 F.3d at 1127–28; *see also Irons v. Carey,* 505 F.3d 846, 850 (9th Cir.2007) ("California Penal Code section 3041[4]

---

**2.** *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

**3.** *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

**4.** At the time of petitioner's parole hearing, California's parole scheme provided that the Board:

    shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravi-

vests [petitioner] and all other California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." (footnote added)).

■ The Supreme Court in *Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), "clearly established that a parole board's decision deprives a prisoner of due process with respect to [his liberty] interest [in parole] if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'" *Irons,* 505 F.3d at 851 (citations omitted); *Hill,* 472 U.S. at 455–57, 105 S.Ct. at 2774–75. When this Court assesses "whether a state parole board's suitability determination was supported by some evidence in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability determinations in [California]." *Irons,* 505 F.3d at 851; *Biggs v. Terhune,* 334 F.3d 910, 915 (9th Cir.2003). Thus, this Court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' in [petitioner's] case constituted an unreasonable application of

the 'some evidence' principle articulated in *Hill* [.]" *Irons,* 505 F.3d at 851.

■ Under California law, prisoners serving an indeterminate sentence for [first] degree murder "may serve up to life in prison, but [ ] become eligible for parole consideration after serving minimum terms of confinement." Although the Board must "normally set a parole release date" before the minimum term has been served, an inmate "'shall be found unsuitable for parole and denied parole if, in the judgment of the [Board,] the prisoner will pose an unreasonable risk of danger to society if released from prison.'"

*Id.* (citations and footnote omitted); *In re Dannenberg,* 34 Cal.4th 1061, 1078, 23 Cal. Rptr.3d 417, 426, 104 P.3d 783 (2005). Factors the Board should consider include the inmate's:

social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the [inmate] may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 C.C.R. § 2402(b–d).[5] However, the overarching consideration in parole suitabili-

---

ty of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.
  P.C. § 3041(b).

**5.** Circumstances tending to establish unsuitability for parole are that the inmate:

(1) committed the offense in an especially heinous, atrocious or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison.
*In re Rosenkrantz,* 29 Cal.4th 616, 653–54, 128 Cal.Rptr.2d 104, 137, 59 P.3d 174 (2002)

ty decisions is public safety. *Irons,* 505 F.3d at 851; *see also In re Lawrence,* 44 Cal.4th 1181, 1212, 82 Cal.Rptr.3d 169, 190, 190 P.3d 535 (2008) ("[T] he relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely some evidence confirms the existence of certain factual findings."); [6] *In re Shaputis,* 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213, 222–23, 190 P.3d 573 (2008) ("[T]he proper articulation of the standard of review is whether there exists 'some evidence' that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor.").

■ Here, the Superior Court found the Board's decision denying petitioner parole was justified, and this finding is not an unreasonable application of the *Hill* "some evidence" standard. To the contrary, the Board weighed the circumstances for and against granting petitioner parole and found petitioner unsuitable for parole based on a number of factors, including: (1) the nature of the commitment offense; (2) petitioner's lack of remorse and insight about his crime and its ramifications; (3) petitioner's unstable social history; (4) petitioner's psychological report; and (5) petitioner's lack of realistic parole plans and future employment.

■ The commitment offense may be a factor tending to show parole unsuitability if "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 C.C.R. § 2402(c)(1). Factors supporting a finding that the inmate committed the offense in an especially heinous, atrocious, or cruel manner include the following:

(A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.

*Rosenkrantz,* 29 Cal.4th at 653–54 n. 11, 128 Cal.Rptr.2d at 137 n. 11, 59 P.3d 174; 15 C.C.R. § 2402(c)(1)(a-e). Nevertheless, "there are few, if any, murders that could *not* be characterized as either particularly aggravated, or as involving some act beyond the minimum required for conviction of the offense." *Lawrence,* 44 Cal.4th at 1218, 82 Cal.Rptr.3d at 196, 190 P.3d 535

---

(footnote omitted), *cert. denied,* 538 U.S. 980, 123 S.Ct. 1808, 155 L.Ed.2d 669 (2003); 15 C.C.R. § 2402(c). On the other hand, circumstances tending to establish suitability for parole are that the inmate:

(1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made

realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release.

*Rosenkrantz,* 29 Cal.4th at 654, 128 Cal. Rptr.2d at 138, 59 P.3d 174; 15 C.C.R. § 2402(d).

6. "[U]nder *Irons, Lawrence* governs the application of the 'some evidence' standard." *Milot v. Haws,* 628 F.Supp.2d 1152, 1155 (C.D.Cal.2009).

(emphasis in original); *In re Rozzo,* 172 Cal.App.4th 40, 53, 91 Cal.Rptr.3d 85 (2009). Thus, "the circumstances of the commitment offense (or any other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public." *Lawrence,* 44 Cal.4th at 1212, 82 Cal. Rptr.3d at 190, 190 P.3d 535; *In re Rico,* 171 Cal.App.4th 659, 673, 89 Cal.Rptr.3d 866 (2009); *see also Irons,* 505 F.3d at 851–52 ("A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released." (quoting *Dannenberg,* 34 Cal.4th at 1071, 23 Cal.Rptr.3d at 421, 104 P.3d 783)).

█ Here, the Board found petitioner carried out the offense "in an exceptionally cruel and callous manner[,]" in "a dispassionate and calculated manner[,]" and "in a manner which demonstrates an exceptionally callous disregard for human suffering" since the victim, a "young man [who] was trying to put himself through college delivering pizza[,]" was ambushed, robbed, beaten, and shot and killed "in an execution-style manner." Lodgment no. 3 at 86–89. Petitioner's crime "was a cold blooded execution-style murder that exceeded the minimum elements necessary for a conviction for first degree murder[,]" *Fransway v. Kane,* 2008 WL 1995114, *13

(N.D.Cal.2008); *Otte v. Mendoza–Powers,* 2008 WL 351798, *5 (E.D.Cal.), *adopted by,* 2008 WL 880565 (E.D.Cal.2008), and constitutes "some evidence" petitioner "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."[7] Lodgment no. 3 at 86; *Shaputis,* 44 Cal.4th at 1259, 82 Cal.Rptr.3d at 227, 190 P.3d 573.

█ Additionally, the Board determined petitioner's lack of insight into his crime and its ramifications and lack of remorse, as well as petitioner's failure to take any responsibility for his actions, made him unsuitable for parole. 15 C.C.R. § 2402(d)(3); Lodgment no. 3 at 87. Indeed, despite the passage of almost twenty years, petitioner continued to maintain he had nothing to do with the crime other than leaving a gun in the bushes for his friends to use, *see,* e.g., Lodgment no. 7 at 5–6, and his statement at the parole hearing focused on his own predicament and minimized his culpability by discussing only "bad decisions" he made, rather than showing any insight or remorse, or taking responsibility for his actions. *See* Lodgment no. 3 at 79–80 ("I can't rehabilitate what transpired back in 1987.... Uh, I made some bad decisions as a kid. I really did, and, uh, I paid for it dearly. And I don't know how much longer I'm going to have to pay for it...."). "[A] lack of insight into the crime can constitute evidence of current dangerousness." *Johnson v. Hartley,* 2009 WL 3617805, *6 (E.D.Cal.2009); *see also Shaputis,* 44 Cal.4th at 1259, 82 Cal.Rptr.3d at 227–28, 190 P.3d 573 (Petitioner's "recent psychological reports reflecting that ... he is unable to gain insight into his antisocial

---

7. Even if this were the only evidence the Board had supporting its determination to deny petitioner parole, the Board would not have deprived petitioner of due process of the law by denying him parole because petitioner

"had not served the minimum number of years to which [he] had been sentenced at the time of the challenged parole denial by the Board." *Irons,* 505 F.3d at 853–54; *Sass,* 461 F.3d at 1129.

behavior despite years of therapy and rehabilitative 'programming,' . . . provide some evidence . . . that petitioner remains dangerous and is unsuitable for parole." (footnotes omitted)); *Rozzo,* 172 Cal. App.4th at 62 n. 9, 91 Cal.Rptr.3d 85 ("[E]vidence that demonstrates a prisoner's insight, or lack thereof, into the reasons for his commission of the commitment offense is relevant to a determination of the prisoner's suitability for parole."). Clearly, these determinations by the Board constitute some evidence showing petitioner is a current threat to public safety and unsuitable for parole.

█ The Board also determined that the report of Bob Ohrling, Ph.D., a clinical psychologist, was inconclusive because it "didn't cover any type of insight [or] . . . remorse on [petitioner's] part." Lodgment no. 3 at 88; Lodgment no. 7 at 6. Thus, this psychological report also provides some evidence supporting the Board's conclusion that petitioner is unsuitable for parole. *See Brazil v. Davison,* 639 F.Supp.2d 1129, 1150 (C.D.Cal.2009) ("A determination in a psychologist's report that an inmate may present a low to moderate risk of violence to the community if released constitutes 'some evidence' supporting a denial of parole, even where such a determination is contained in a report that also may find a low risk of violence by a different testing standard or other positive factors.").

Finally, the Board found petitioner's unstable social history made him unsuitable for parole. 15 C.C.R. § 2402(c)(3). The petitioner began selling drugs when he was 16 years old, dropped out of high school, and hung around with gang members, Lodgment no. 3 at 21–26, 87, all of which support the Board's conclusion that petitioner has an unstable social history, *Torricellas v. Davison,* 519 F.Supp.2d 1040, 1055 (C.D.Cal.2007); *Zavala v.*

*Clark,* 2009 WL 3011424, *6 (E.D.Cal. 2009), and, when considered with the other factors, provides some evidence petitioner is a danger to society if released from custody.

In short, the various factors set forth by the Board provide "some evidence" supporting the Board's determination that petitioner was unsuitable for parole; therefore, petitioner was not deprived of due process of law. *Irons,* 505 F.3d at 853–54; *Rosas v. Nielsen,* 428 F.3d 1229, 1232–33 (9th Cir.2005) (per curiam); *see also Rose v. Kane,* 270 Fed.Appx. 610, 611–12 (9th Cir.2008) ("Some evidence" supports Board decision denying parole when Board relied, among other factors, upon "the facts of the commitment offense" and inmate's "demonstrated lack of insight into the commitment offense" in determining inmate was unsuitable for parole); *Lawrence,* 44 Cal.4th at 1228, 82 Cal. Rptr.3d at 204, 190 P.3d 535 ("[W]here the record . . . contains evidence demonstrating that the inmate lacks insight into his or her commitment offense or previous acts of violence, even after rehabilitative programming tailored to addressing the issues that led to commission of the offense, the aggravated circumstances of the crime reliably may continue to predict current dangerousness even after many years of incarceration."). Accordingly, the California Supreme Court's denial of petitioner's due process claim was neither contrary to, nor an unreasonable application of, clearly established law.

## RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the pe-

tition and dismissing the action with prejudice.

DATE: November 17, 2009.