**Theresa Annette TORRICELLAS, aka Nancy Montgomery, Petitioner,**

v.

**Dawn DAVISON, Warden, Respondent.**

**No. CV 06–0934–RSWL (RC).**

United States District Court, C.D. California.

Oct. 22, 2007.

---

Theresa Annette Torricellas, Corona, CA, Pro se.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

RONALD S.W. LEW, Senior District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, as well as petitioner's Objections (but not exhibits, which go beyond the record in this action), and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the petition for writ of habeas corpus and dismissing the action with prejudice.

1. The San Diego County Probation Department, in a supplemental report dated April 17, 1985, set forth the following "condensation of the court reporter's transcript of [petitioner's] change of plea" proceeding:

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on the parties.

## JUDGMENT

Pursuant to the Order of the Court adopting the findings, conclusions, and recommendations of United States Magistrate Judge Rosalyn M. Chapman,

IT IS ADJUDGED that the petition for writ of habeas corpus is denied and the action is dismissed with prejudice.

## REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

ROSALYN M. CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Ronald S.W. Lew, Senior United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 01–13 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On April 17, 1985, in San Diego County Superior Court case no. CR72156, petitioner Theresa Annette Torricellas, aka Nancy Montgomery, pleaded guilty to one count of second degree murder in violation of California Penal Code ("P.C.") § 187 and admitted a firearm enhancement under P.C. § 12022(a).[1] Lodgment 1. Peti-

* [Petitioner], in response to questions by Judge Ben Hamrick, related the following: [Petitioner] told the Court that Paul Henry owed Daniel McGinnis some money and the three of them went to the bank's automatic

tioner was sentenced to state prison for sixteen years to life. *Id.* Petitioner appealed the judgment and petitioned for a writ of habeas corpus to the California Court of Appeal, which dismissed the appeal and denied the writ in a consolidated, unpublished opinion filed September 3, 1987. Lodgment 3.

## II

On March 10, 1995, petitioner had her initial parole suitability hearing before a panel of the California Board of Prison Terms ("the Board"),[2] which denied petitioner parole for three years. Lodgment 13 at 63–66. On March 24, 1998, petitioner had her second parole suitability hearing before a panel of the Board, which denied petitioner parole for five years. Lodgment 14 at 41–45. On May 22, 2003, petitioner

had her third parole suitability hearing before a panel of the Board, which, effective August 20, 2003, denied petitioner parole for four years. Lodgment 4 at 77–82. It is this denial of parole that petitioner challenges before the Court.

In denying petitioner parole in 2003, the Board cited several reasons for finding petitioner's release "would pose an unreasonable risk of danger to society and a threat to public safety":

[1] First and foremost was the commitment offense and the nature of the offense. It was carried out in a callous manner with a disregard for human suffering. . . . [T]he victim was abused during the commission of this offense. He was taken from his residence or motel room and driven out—shot and

teller machine. [Petitioner] withdrew some of the money from the machine and learned at that time that Henry had a large remaining balance; she informed McGinnis of this fact. [Petitioner] stated, "I felt I knew what was going to happen. I don't know, I don't know, I just felt like it put something in motion." The trio then returned to the motel in Henry's car and she went into his room, leaving McGinnis and Henry in the car, and "cleaned up the apartment room and we left." They then went to Mission Valley and [petitioner] "felt like I knew what was going to happen, okay? It hadn't been discussed, but I knew . . ." McGinnis had the gun and took it where ever he went. [Petitioner] did not remember which one of them put it in the car because they had taken some drugs previously, coke and speed, she thought. When asked why they picked Mission Valley, [petitioner] responded, "Because I felt like, well, if you're going to do it, you know, at least go someplace not to draw attention." [Petitioner] admitted that it was in her mind that Henry was going to be killed for the purpose of taking his card and getting the balance of his money. "I guess, among other things, I guess so, yeah." McGinnis was driving the car, Henry in the passenger seat, and [petitioner] was in the rear seat, holding the shotgun. Upon arrival at the murder

scene, McGinnis ordered the victim out of the car. [Petitioner] then asked McGinnis "if he wanted me to do it (shoot Henry)." [Petitioner] then walked around to see if there was anyone else around and upon returning, heard the gun go off. They then left the scene and went to Mexico. . . . When asked if [petitioner] knew they were going to Mission Valley for the purpose of robbing and killing Henry, [petitioner] replied, "I felt it would take place, but I didn't—I was hoping something would change, you know. I mean like you feel something's going to happen, but something can always change it because it isn't written in stone, you know." While stating that she did not pull the trigger, [petitioner] stated, "I didn't do nothing to stop it, yeah, like the robbery, yeah. And I feel that I knew enough, you know, like when I told him about there being more money that I knew enough about him or, you know, what could happen by saying that, you know. I mean, you know, it is almost inevitable, I don't know, but it just seemed like it, I don't know. Yeah, because I didn't do anything to stop it. You know, I don't know." Lodgment no. 2 at 1–3.

**2.** The Board was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings. P.C. § 5075(a).

killed.... [Petitioner] and her crime partner ... kidnap[ped] the victim, took him for—in his car out to a remote area and the crime partner used a shotgun to shoot and kill the victim. He was shot in the face. He died as a result of those injuries. Before he was killed, property was taken from him, including an ATM card, money was withdrawn from his account by [petitioner], and other property was taken from him. [2] In regards to [petitioner's] prior criminality, she ... was involved in an escalating pattern of criminal conduct at the time of the commitment offense. She was also involved with the use and abuse of drugs at an early age. She dropped out of regular high school. She has failed previous grants of probation and cannot be counted upon to avoid criminality. She failed to profit from society's previous attempts to correct her criminality. Such attempts include juvenile probation, county jail time, and ... she was committed to the CRC at one point to address her drug problems. Her unstable history includes a total of 38 arrests for various offenses which included driving under the influence, lewd conduct, prostitution, possession of drugs, under the influence of drugs, battery on a nonprisoner, failure to appear, resisting arrest and auto theft.... All 38 arrests did not result in convictions but she was convicted in a number of instances and ... was sentenced to jail and placed on probation. [3] Regarding [petitioner's] institutional behavior, her behavior since her last parole consideration five years ago, she has received one [CDC] 115 and that was ... for smoking in her cell.... In addition to that, she's had ... an additional 24[CDC] 115s and 60[CDC] 128(a)'s, at least four since her last parole consideration hearing. [f] ... [4] In regards to the psychological evaluation, [petitioner] didn't take part in one since

her last hearing. She chose not to. She has no confidence in the evaluator she stated, but I will cite her last evaluation[,] which took place on February 2, 1998[,] in which Dr. Robert McDaniel states that: "Violence potential outside of a controlled setting was considered to be greater than average in the past due to the recklessness and antisocial nature of her behavior. In my opinion it remains the same."

Lodgment 4 at 78–80. The Board further explained its decision to deny petitioner parole for a period of four years, and made certain recommendations to petitioner, stating:

> ▮ [Petitioner] needs to participate in any and all self-help programs that may become available and this Panel feel's that [6] [petitioner] needs to delve deeper into the causation factors involved in the commitment offense. And in view of [petitioner's] assaultive history and her continued negative behavior, there is no indication that she would behave differently if paroled.... [Petitioner] apparently has made an effort to behave herself. One administrative [CDC] 115 in a five year period for an individual with the past disciplinary record that she has is actually—hard to say—but it is an improvement. [However, petitioner] committed the offense ... in a cruel manner with a disregard for human suffering. More specifically, she and her crime [partner] were involved in a kidnap and robbery that led to the death of an unarmed victim. He was shot in the face with a shotgun by her crime partner. As a result, a longer period of observation and evaluation is required before [the Board] can set a parole date. Also, [petitioner] has a prior record of violent behavior.... She has a large number of arrests, some including violence.... Her record ... primarily re-

volves around drug abuse and a lot of prostitution activity. And also we talked about her disciplinary record, the number of [CDC] 115s.

Lodgment 4 at 81–82.

On January 14, 2005, petitioner filed a habeas corpus petition in the San Bernardino County Superior Court challenging the Board's 2003 decision, and that petition was denied on January 21, 2005, with petitioner directed to file an amended petition stating her contentions clearly and concisely. Lodgment nos. 5–6. On February 10, 2005, petitioner sought reconsideration from the San Bernardino County Superior Court, which denied her motion as untimely. Lodgment nos. 7–8. On March 11, 2005, petitioner filed a habeas corpus petition in the California Court of Appeal, which denied the petition on March 18, 2005. Lodgment nos. 9–10. Finally, on April 6, 2005, petitioner filed a habeas corpus petition in the California 12 Supreme Court, which denied the petition on January 26, 2006, with citations to *In re Dannenberg*, 34 Cal.4th 1061, 23 Cal. Rptr.3d 417, 104 P.3d 783 (2005), and *In re Rosenkrantz*, 29 Cal.4th 616, 128 Cal. Rptr.2d 104, 59 P.3d 174 (2002). Lodgment nos. 11–12.

### III

On February 16, 2006, petitioner, proceeding pro se, filed the pending petition for writ of habeas corpus, and on May 18, 2006, respondent filed her answer. On July 11, 2006, petitioner filed her reply.

The pending petition raises the following grounds for habeas corpus relief:

Ground One—"The retroactive application of parole statute permitting denial of parole in excess of two years for case involving single murder offense and other illegal parole suitability criteria set forth in parole board decision forms are ex post facto laws in violation of the U.S. Constitu-

tion, Art. I, § 10, and also as applied in petitioner's case" (Petition at 5);

Ground Two—"The parole board denied [petitioner] due process of law by denying petitioner various procedural rights at petitioner's parole hearing[,] which prejudiced the hearing outcome ... by reliance on false evidence to deny parole and determine an excessive parole denial period" (*id.*); and

Ground Three—"The parole board's denial of parole violates due process of law under [the Fourteenth Amendment] because the decision was reached in the absence of individualized consideration and without consideration of of [sic] 15 CCR [§ ] 2402 parole consideration criteria and the decision is not based on reliable evidence of unsuitability for parole" (Petition at 6).

### DISCUSSION

### IV

The Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA") "circumscribes a federal habeas court's review of a state court decision." *Lockyer v. Andrade*, 538 U.S. 63, 70, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003). As amended by the AEDPA, 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless .27 the adjudication of the claim [¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as I determined by the Supreme Court

of the United States; or [¶]. (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, under the AEDPA, a federal court shall presume a state court's determination of factual issues is correct, and petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

■ The California Supreme Court reached the merits of petitioner's claims when it denied her habeas corpus petition without a reasoned decision. *Gaston v. Palmer,* 417 F.3d 1030, 1038 (9th Cir.2005), *amended by,* 447 F.3d 1165 (9th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 979, 166 L.Ed.2d 742 (2007); *Hunter v. Aispuro,* 982 F.2d 344, 348 (9th Cir.1992), *cert. denied,* 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993). Since no state court has provided a reasoned decision addressing the merits of petitioner's claims, this Court must conduct an independent review of the record to determine whether the California Supreme Court's denial of petitioner's claims was contrary to, or an unreasonable application of, clearly established federal law. *Nunes v. Ramirez–Palmer,* 485 F.3d 432, 438 (9th Cir.2007); *Reynoso v. Giurbino,* 462 F.3d 1099, 1108 (9th Cir.2006).

## V

■ Article I of the United States Constitution prohibits the states from passing an ex post facto law. U.S. Const. Art. I, § 10, cl. 1. "Although the Latin phrase 'ex post facto' literally encompasses any law passed 'after the fact,' it has long been recognized ... that the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990). The ex post facto clause is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *California Dep't of Corr. v. Morales,* 514 U.S. 499, 504, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995) (citations omitted). Thus, an ex post facto law "punishes as a crime an act previously committed, which was innocent when done[,] which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with a crime of any defense available according to law at the time when the act was committed...." *Collins,* 497 U.S. at 42, 110 S.Ct. at 2719 (quoting *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925)); *Stogner v. California,* 539 U.S. 607, 612, 123 S.Ct. 2446, 2450, 156 L.Ed.2d 544 (2003).

■ In Ground One, petitioner claims the Board's four-year denial of parole to her violates the ex post facto clause because the 1994 amendment to P.C. § 3041.5(b)(2)(B),[3] authorizing the Board

---

**3.** Since its most recent amendment in 1994, P.C. § 3041.5 has provided, in pertinent part:

The board shall hear each case annually thereafter, except the board may schedule the hearing no later than the following: ... (B) Up to five years after any hearing at which parole is denied if the prisoner has been convicted of murder, and the board finds that it is not reasonable to expect that parole would be granted at a hearing dur-

ing the following years and states the bases for the finding in writing.... The board shall adopt procedures that relate to the criteria for setting the hearing between two and five years.

P.C. § 3041.5(b)(2)(B). When petitioner committed murder in 1984, Section 3041.5 provided, in pertinent part:

The board shall hear each case annually thereafter, except the board may schedule

to deny parole for up to five years, retroactively increased the punishment for her commitment offense, which occurred on November 8, 1984.[4] This claim is without merit.

Retroactive changes in laws governing parole of prisoners, in some instances, may violate the ex post facto clause. *Garner v. Jones,* 529 U.S. 244, 250, 120 S.Ct. 1362, 1367, 146 L.Ed.2d 236 (2000); *Lynce v. Mathis,* 519 U.S. 433, 445–46, 117 S.Ct. 891, 898, 137 L.Ed.2d 63 (1997). However, to prevail on an ex post facto claim, a prisoner must show both that the law she challenges: (1) operates retrospectively, or that it applies to conduct completed before its enactment, and (2) that it raises the penalty from whatever the law provided when she acted. *Johnson v. United States,* 529 U.S. 694, 699, 120 S.Ct. 1795, 1800, 146 L.Ed.2d 727 (2000); *Morales,* 514 U.S. at 506 n. 3, 115 S.Ct. at 1602 n. 3.

A law applied retrospectively or retroactively improperly raises the penalty when "it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Morales,* 514 U.S. at 509, 115 S.Ct. at 1603; *Garner,* 529 U.S. at 250, 120 S.Ct. at 1367. In determining retroactivity, "[t]he critical question is whether the law changes the legal consequences of acts completed before its effective date." *Weaver v. Graham,* 450 U.S. 24, 31, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981); *Himes v. Thompson,* 336 F.3d 848, 854 (9th Cir.2003). Here, P.C. § 3041.5 in effect in 1984 allowed the Board to deny an inmate such as petitioner, who had been convicted of one life offense, a new parole hearing for up to two years from the date parole was previously denied; whereas, P.C. § 3041.5 in effect in 2003 allowed the Board to deny an inmate a new parole hearing for up to five years. Thus, Section 3041.5, as modified in 1994, was applied retroactively to petitioner in 2003 since it affected the punishment she received for the murder she committed in 1984. *Weaver,* 450 U.S. at 31–33, 101 S.Ct. at 965–66; *Himes,* 336 F.3d at 854–55.

However, the 1994 amendment to P.C. § 3041.5 did not "increas[e] the measure of punishment attached to the covered crimes." *Morales,* 514 U.S. at 509, 115 S.Ct. at 1603. In *Morales,* the Supreme Court addressed the identical issue petitioner raises, and upheld against an ex post facto challenge a 1981 amendment to P.C. § 3041.5, which "introduced the possibility that after the initial parole hearing, the Board would not have to hold another hearing the very next year, or the year after that, if it found no reasonable probability that [the inmate] would be deemed suitable for parole in the interim period."

---

the next hearing no later than (A) two years after any hearing at which parole is denied if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding or, (B) three years after any hearing at which parole is denied if the prisoner has been convicted, in the same or different proceedings, of more than one offense which involves the taking of a life, and the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding.
P.C. § 3041.5(b)(2)(A) (1984).

4. Petitioner also claims the Board's use of certain forms during her parole hearing (Petition, Exh. I) is another ex post facto application of parole procedures that were not in existence when she was convicted and sentenced. Petition, Exh. WW. However, the forms simply present in an easily accessible manner the criteria set forth in California statutes and regulations to determine whether a prisoner is suitable for parole, *see* 15 C.C.R. § 2402; thus, these forms are only a mechanism to record parole considerations and, as such, have no effect on petitioner's sentence.

*Id.* at 507, 115 S.Ct. at 1602. Specifically, the Supreme Court held the 1981 amendment to P.C. § 3041.5 "had no effect on the standards for fixing a prisoner's initial date of 'eligibility' for parole, or for determining his 'suitability' for parole and setting his release date"; rather, "the 1981 amendment simply 'alter[ed] the method to be followed' in fixing a parole release date under identical substantive standards." *Id.* at 507–08, 115 S.Ct. at 1602 (citations omitted). Under such circumstances, "[t]he [1981] amendment creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes, and such conjectural effects are insufficient under any threshold we might establish under the Ex Post Facto Clause." *Id.* at 509, 115 S.Ct. at 1603. Indeed, the Supreme Court concluded that since the 1981 amendment had no effect on an inmate's initial parole suitability hearing, but only affected the timing of subsequent hearings, and because the Board "retains the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner[,]" it did not increase an inmate's punishment. *Id.* at 511, 115 S.Ct. at 1604.

Here, like the 1981 amendment upheld in *Morales,* the 1994 amendment to P.C. § 3041.5 did no more than change the timing of subsequent parole hearings, while having no effect on the inmate's initial parole suitability hearing or on the standards used in considering whether an inmate is suitable for parole. Moreover, as with the 1981 amendment, annual parole suitability hearings remain the default under the 1994 amendment, and the Board is required to make particularized findings when determining the subsequent parole hearings will be more than a year later. *Morales,* 514 U.S. at 511, 115 S.Ct. at 1604. Since the Board "retains the authority to

tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner[,]" there has been no ex post facto violation. *Id.* at 509, 115 S.Ct. at 1602–05; *see also Johnson v. Gomez,* 92 F.3d 964, 967–68 (9th Cir.1996) (holding change in ultimate parole decisionmaker from Board to Governor does not violate ex post facto clause), *cert. denied,* 520 U.S. 1242, 117 S.Ct. 1848, 137 L.Ed.2d 1050 (1997); *McKissick v. Hamlet,* 2002 WL 1837800, *5 (N.D.Cal.) (The 1994 amendment to P.C. § 3041.5 does not violate ex post facto clause since "there is no more than a speculative and attenuated possibility that [petitioner's] punishment will be increased by the three-year delay between his parole consideration hearings permitted under the amended law."), *affirmed by,* 116 Fed.Appx. 163 (9th Cir.2004). Thus, the California Supreme Court's denial of Ground One was neither contrary to, nor an unreasonable application of, clearly established federal law.

## VI

■ The Fourteenth Amendment's due process clause provides that a person may not be deprived of life, liberty, or property without due process of law. The Supreme Court "examine[s] procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State . . .; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (citations omitted); *Sass v. California Bd. of Prison Terms,* 461 F.3d 1123, 1127 (9th Cir.2006). "Under the 'clearly established' framework of

*Greenholtz* [5] and *Allen,*[6] ... California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion v. Duncan,* 306 F.3d 895, 902 (9th Cir.2002)(footnotes added); *Sass,* 461 F.3d at 1127–28; *see also Irons v. Carey,* 505 F.3d 846, 850 (9th Cir.2007) ("California Penal Code section 3041 [7] vests [petitioner] and all other California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." (footnote added)).

In Ground Two, petitioner claims she was denied various requirements of procedural due process at the May 2003 parole suitability hearing, including the right to speak, to ask and answer questions, and to explain the circumstances surrounding the commitment offense and her institutional stay. She also claims the panel refused to consider mitigating circumstances related to the offense, which caused the panel to rely on false evidence in its decision to deny parole to her for four years, and refused to consider exhibits and other documentary evidence she brought to the hearing. Finally, petitioner claims the panel was "hostile, combative, [and] evasive." These procedural due process claims are all without merit.

■ "It is axiomatic that due process 'is flexible and calls for such procedural protections as the particular situation demands.'" *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106 (citations omitted); *Pedro v. Oregon Parole Bd.,* 825 F.2d 1396, 1398 (9th Cir.1987), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988). In parole suitability hearings, the state procedure must "afford [ ] an opportunity to be heard, and when parole is denied [the Board must] inform [ ] the inmate in what respects [s]he falls short of qualifying for parole." *Greenholtz,* 442 U.S. at 16, 99 S.Ct. at 2108; *Bermudez v. Duenas,* 936 F.2d 1064, 1066 (9th Cir.1991). Moreover, under California law, "[p]risoners are entitled to be present at the hearing, speak and offer evidence on their own behalf, and prisoners serving a life sentence are entitled to be represented by counsel at the hearing." *Biggs v. Terhune,* 334 F.3d 910, 915 (9th Cir.2003) (citations omitted); P.C. §§ 3041.5(a), 3041.7. Additionally, if a parole date is not set, an inmate is entitled to "a written statement setting forth the reason or reasons for refusal to set a parole date, [including] suggest[ed] activities in which he or she might participate that will benefit him or her while he or she is incarcerated." P.C. § 3041.5(b)(2) (2003).

■ Here, petitioner was present at her parole suitability hearing and represented by counsel. Lodgment no. 4 at 1–2. However, petitioner contends she was denied the right to speak for herself and to ask and answer questions at her parole suitability hearing. The Court disagrees. The petitioner was provided ample oppor-

---

**5.** *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

**6.** *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

**7.** At the time of petitioner's parole hearing, California's parole scheme provided that the Board:

shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

P.C. § 3041(b) (2003).

tunity to speak on her own behalf throughout the hearing, and she engaged the panel in a lengthy discussion about the facts she disputed in the probation report of her offense.[8] *See* Lodgment no. 4 at 17–28, 61–66. The petitioner also discussed her prior criminality, drug use, social history, institutional record, participation in prison vocational and therapy programs, her last psychological evaluation, her parole plans, and gave a closing statement. *See* Lodgment 4 at 28–59, 70–76. Thus, there is no merit to petitioner's claim that she was denied the opportunity to speak on her own behalf at her parole hearing.

■ The petitioner also claims the panel refused to consider documentary evidence she wanted to present to support her claim of "innocence." *See* Petition at 5, Exh. WW. Specifically, petitioner wanted the victim's bank account statement, showing that five $40.00 withdrawals were made from the victim's bank account on November 8, 1984, the date petitioner and her accomplice murdered the victim.[9] *See* Petition, Exh. CC. The petitioner argues

that this documentation proves the factual summary upon which the Board relied was erroneous in stating the withdrawals occurred between 5:49 a.m. and 5:55 a.m., rather than later on the date the victim was murdered. *See* Petition, Exh. E; Lodgment no. 4 at 23–25.

California law, as discussed above, allows an inmate such as petitioner to present evidence at her parole hearing. *See, e.g., Biggs,* 334 F.3d at 915. To implement this law, the Board has promulgated regulations that provide that "[a] prisoner shall have the right to present relevant documents to the hearing panel. The documents should be brief, *pertinent,* and clearly written. They may cover any *relevant matters* such as mitigating circumstances, disputed facts or release planning." 15 C.C.R. § 2249 (emphasis added). Here, the documentary evidence petitioner sought to present was simply not relevant to any matter before the Board; thus, the Board did not deny petitioner due process in failing to consider

---

8. Although petitioner pleaded guilty to second degree murder, she maintained at the parole hearing that she was **not** guilty of murder and she was the victim of "a police frame-up[,]" and petitioner objected when she was not allowed to go step-by-step through every "wrong" statement in the factual summary of her murder conviction. Lodgment no. 4 at 20–25, 61–62, 66, 71. Here, petitioner complains she did not have the opportunity to speak on her own behalf at the parole hearing, but her real complaint is that the Board did not allow her to detail each and every perceived error in the factual summary of her conviction, and, ultimately, that the Board did not accept her version of the facts and circumstances surrounding her offense, as well as her claim of innocence. *See, e.g.,* Petition at 5, Exh. WW. Yet, petitioner was repeatedly told the purpose of the hearing was to assess her parole suitability and that the Board could not, and would not, retry her murder conviction. *See, e.g.,* Lodgment 4 at 11, 19, 23, 25, 62–66.

9. The petitioner has incorporated portions of her habeas corpus petition to the California Supreme Court into her pending federal habeas corpus petition. Petition at 5, Exh. WW. In her petition to the California Supreme Court, petitioner claimed she was not provided an opportunity to present to the panel the declarations of her co-defendant, Dan McGinnis, and his brother, Bruce McGinnis, which she attaches as Exhibits S and T to her pending petition. *Id.* However, petitioner never asked the panel if she could present such evidence; she merely vaguely stated she had "proof, you know, circumstantial proof" she was framed by the police. Lodgment no. 4 at 62. This statement evinces no intent to present Exhibits S and T, or any other document, to the panel. Moreover, portions of Exhibits S and T were executed **after** the date of petitioner's parole suitability hearing on May 22, 2003.

it.[10]

■■■■■ Finally, the "Due Process Clause clearly requires a 'fair trial in a fair tribunal[.]' " *Bracy v. Gramley*, 520 U.S. 899, 904–05, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 (1997) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)); *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *see also O'Bremski v. Maass*, 915 F.2d 418, 422 (9th Cir.1990) (inmate entitled to have parole release date considered by tribunal free from bias or prejudice), *cert. denied*, 498 U.S. 1096, 111 S.Ct. 986, 112 L.Ed.2d 1070 (1991). "Fairness, of course, requires an absence of actual bias...." *In re Murchison*, 349 U.S. at 136, 75 S.Ct. at 625. "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.' " *Withrow*, 421 U.S. at 47, 95 S.Ct. at 1464 (quoting *In re Murchison*, 349 U.S. at 136, 75 S.Ct. at 625). Here, petitioner's claims of bias are not supported by the record, which shows instead that the panel took into account the specific facts of petitioner's case and based its decision on an individualized determination of parole eligibility. *Soza v.*

*Kane*, 2007 WL 1593243, *2 (N.D.Cal. 2007); *Clifford v. Kane*, 2007 WL 1031148, *6 (N.D.Cal.2007).

In short, petitioner received the procedural safeguards she was entitled to at her parole suitability hearing, and the California Supreme Court's denial of her procedural due process claims was neither contrary to, nor an unreasonable application of, clearly established federal law.

## VII

■■■■■ The Board's decision satisfies due process if "some evidence supports the decision[.]" *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985); *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam).[11] Although "[t]he 'some evidence' standard is minimally stringent," *Powell v. Gomez*, 33 F.3d 39, 40 (9th Cir.1994) (citations and internal quotation marks omitted); *Hill*, 472 U.S. at 455–56, 105 S.Ct. at 2774, " 'the evidence underlying the decision must have some indicia of reliability.' " *Biggs*, 334 F.3d at 915; *Rosas*, 428 F.3d at 1232. Nevertheless, "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the ...

10. The record shows the Board did consider various other documents in petitioner's parole suitability hearing, but does not show the nature of those documents. *See* Lodgment no. 4 at 12–13. Additionally, the Board asked petitioner whether she had a certificate demonstrating she completed a vocational graphic arts program or letters supporting parole for her, but petitioner stated she had forgotten to bring the certificate, and did not provide letters of support. *See* Lodgment 4 at 48, 54–55 and 58.

11. Although *Hill* involved the quantum of evidence necessary to satisfy due process when a prison disciplinary board revokes good time credits, the Ninth Circuit has repeatedly applied *Hill* to parole cases, concluding "the Supreme Court ha[s] clearly established that a

parole board's decision deprives a prisoner of due process with respect to [his protected liberty] interest if the board's decision is not supported by 'some evidence in the record[.]' " *Irons*, 505 F.3d at 850; *Sass*, 461 F.3d at 1128–29; *Rosas*, 428 F.3d at 1232–33; *see also Sims v. Rowland*, 414 F.3d 1148, 1151 (9th Cir.2005) ("Although the statutory formulation restricts federal law to Supreme Court precedent, ... 'Ninth Circuit precedent may be persuasive authority for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law [under the AEDPA], and may also help us determine what law is clearly established.' "), *cert. denied sub nom., Sims v. Hickman*, 546 U.S. 1066, 126 S.Ct. 809, 163 L.Ed.2d 637 (2005).

board." *Hill,* 472 U.S. at 455–56, 105 S.Ct. at 2774; *Sass,* 461 F.3d at 1128.

■ "When [this Court] assess[es] whether a state parole board's suitability determination was supported by 'some evidence' in a habeas case, [this Court's] analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons,* 505 F.3d at 850; *Biggs,* 334 F.3d at 915. Under California law, the Board must consider numerous factors in making its determination whether to grant parole, including the inmate's:

> social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the [inmate] may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

California Code of Regulations ("C.C.R.") § 2402(b-d) (2003). However, the overarching consideration in parole suitability decisions is public safety, and the factors listed in Section 2402 are nonexclusive. *In re Barker,* 151 Cal.App.4th 346, 363–64, 59 Cal.Rptr.3d 746 (2007); *In re Elkins,* 144 Cal.App.4th 475, 487, 50 Cal.Rptr.3d 503 (2006).

In Grounds Two and Three, petitioner claims she was denied due process of law because the Board's decision denying parole to her was based on false and unreliable evidence about her offense and the Board did not consider the appropriate criteria. There is no merit to this claim.

Here, the Board weighed the circumstances for and against granting petitioner parole and found petitioner unsuitable for parole based on a number of factors, including: (1) the nature of the commitment offense, (2) petitioner's prior criminality, which includes acts of violence, and her unstable social history, which includes dropping out of school and drug abuse, (3) petitioner's institutional behavior, (4) petitioner's failure to participate in self-help groups, and (5) petitioner's last psychological evaluation, which found petitioner's potential for violence outside a controlled setting "to be greater than average ... due to [petitioner's] recklessness and [the] antisocial nature of her behavior[,]" as well as petitioner's refusal to have a more recent psychological evaluation. These are all appropriate factors for the Board to consider under 15 C.C.R. § 2402.

■ In determining suitability for parole, for example, Section 2402 requires the Board to consider whether the commitment crime was "committed in an especially heinous, atrocious or cruel manner," taking into consideration, for example, whether the crime "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." 15 C.C.R. § 2402(c)(1). Here, the Board found petitioner and McGinnis took property from the victim, including an ATM card petitioner used to withdraw money from the victim's account, before petitioner and McGinnis took the victim "in his car out to a remote area and the crime partner used a shotgun to shoot and kill the victim [who] was shot in the face [and] died as a result of those injuries." [12]

---

12. Although petitioner disputes the accuracy of certain facts in the probation report, she does not challenge the fact that she withdrew money from the victim's bank account prior to her and McGinnis taking the victim out to a remote area, where McGinnis shot and

Lodgment no. 4 at 78–79. These findings are supported by some evidence in the record having some indicia of reliability, including, for instance, the probation reports,[13] *see* Petition, Exh. Q; Lodgment no. 2, and they are sufficient to constitute "some evidence" to support the Board's determination. *Sass*, 461 F.3d at 1129; *Rosas*, 428 F.3d at 1232–33.

■ The Board also properly considered petitioner's criminal record prior to the offense, which included "a total of 38 arrests for various offenses, including driving under the influence, lewd conduct, prostitution, possession of drugs, [being] under the influence of drugs, battery on a non-prisoner, failure to appear, resisting arrest and auto theft[,]" as well as petitioner's unstable social history, which included the use and abuse of drugs at an early age, dropping out of high school, and failing previous grants of probation. 15 C.C.R. § 2402(c)(2–3) and (d). These findings, too, constitute "some evidence" sufficient

to support the Board's denial of parole to petitioner. *Collier v. Ylst*, 2007 WL 2318973, *3, 5 (N.D.Cal.2007); *Kobe v. Kane*, 2007 WL 1462386, *5 (N.D.Cal. 2007).

■ In addition, the Board also considered petitioner's disciplinary record in prison, concluding that although petitioner had somewhat improved her conduct since her last parole hearing, she had, nevertheless, received a total of 25 CDC 115 disciplinary reports[14] and 60 128–A disciplinary reports[15] while incarcerated. Lodgment no. 4 at 39, 79–80. This is a proper factor for the Board to consider, *see* 15 C.C.R. § 2402(c)(6) (One factor tending to show unsuitability for release is that the inmate "has engaged in serious misconduct in prison."), and it also provides "some evidence" for the Board's denial of parole.[16] *Kobe*, 2007 WL 1462386 at *5; *Jameson v. Woodford*, 2007 WL 963275, *8 (E.D.Cal.2007), *adopted by*,

killed the victim. Rather, petitioner challenges, for instance, whether the withdrawal occurred in the morning or evening before the victim was killed, and whether the victim was shot in the face or the neck. *See* Petition, Exh. WW; Lodgment no. 4 at 20–25, 62–65. Although petitioner has attempted to pick apart the report's facts, it remains that petitioner pleaded guilty to, and was convicted of, second degree murder, and the Board was entitled to rely on the probation reports and other evidence to establish the nature and circumstances surrounding petitioner's crime. *Morales v. Cal. Dep't of Corrs*, 16 F.3d 1001, 1005 (9th Cir.1994), *overruled on other grounds, California Dep't of Corr. v. Morales*, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995); *Oldright v. Kane*, 2007 WL 1101472, *1 (E.D.Cal.2007).

13. Although the Court has not been provided a list of all documents the Board considered in denying parole to petitioner, it is clear the Board had access to the probation reports, which are part of petitioner's central or "C" file. *See* Lodgment no. 4 at 3; Lodgment no. 14 at 7, 9–10.

14. A CDC 115 is given when misconduct is not minor in nature, such as administrative or serious rules violations. 15 C.C.R. §§ 3312(a)(3), 3314–15.

15. A CDC 128–A or "Custodial Counseling Chrono," is given for minor misconduct which occurs after verbal counseling or if documentation of the minor misconduct is needed. 15 Cal.Code of Regulations ("C.C.R.") § 3312(a)(2).

16. Although petitioner complains that certain of the misconduct charges against her are "false," Petition, Exh. WW, she provides no evidence that this is so, and her conclusory allegations are insufficient to warrant habeas corpus relief. *Jones v. Gomez*, 66 F.3d 199, 204–05 & n. 1 (9th Cir.1995), *cert. denied*, 517 U.S. 1143, 116 S.Ct. 1437, 134 L.Ed.2d 559 (1996); *James v. Borg*, 24 F.3d 20, 26 (9th Cir.), *cert. denied*, 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994).

2007 WL 1574580 (E.D.Cal.2007); 15 C.C.R. § 3315.

██ The Board also found petitioner "needs to participate in any and all self help programs that may become available . . . to delve deeper into the causation factors involved in the commitment offense." Lodgment no. 4 at 81. Clearly, a reasonable inference from this recommendation is that petitioner has not sufficiently participated in institutional activities to help her function within the law upon release, which is a proper factor for the Board to consider in assessing petitioner's parole suitability. 15 C.C.R. § 2402(c)(9). Thus, this finding, too, is sufficient to constitute "some evidence" to support the Board's determination to deny parole to petitioner. *Rosas,* 428 F.3d at 1232–33.

██ Further, and most importantly, the Board found that petitioner had refused to have a psychological evaluation since her last parole suitability hearing and her prior psychological evaluation found petitioner's " '[v]iolence potential outside of a controlled setting was considered to be greater than average in the past due to the recklessness and antisocial nature of her behavior. . . .' " Lodgment no. 4 at 80. Although petitioner raised many objections to the prior psychological evaluator and refused to have a more current evaluation, "the incomplete psychological evaluation here left a gap in the overall picture of [petitioner] and the [Board] was not required to assume the missing information would be positive information." *Arnold v. Ornoski,* 2007 WL 1593269, *9 (N.D.Cal.2007). Thus, the lack of a current psychological report, as well as an unfavorable previous report, each provides "some evidence" supporting the Board's determination to deny parole to petitioner. *Rosas,* 428 F.3d at 1232–33.

Lastly, there is no basis for petitioner's claim that the Board completely failed to consider the favorable circumstances tending to show her suitability for parole, as listed in 15 C.C.R. § 2402(c)-(d). Petition at Exh. WW. Contrary to petitioner's claim, the Board did consider and incorporate both the favorable and unfavorable factors into its decision. *See* Lodgment no. 4. Here, the only factors showing petitioner's suitability for parole were her positive evaluations from prison vocational programs, her completion of a vocational graphic arts program, and her improved institutional behavior since her last parole hearing. Lodgment no. 4 at 41–43, 79–81. The Board considered these factors and found they did not outweigh the negative factors discussed above.

For the foregoing reasons, each of the factors set forth by the Board constitutes "some evidence" supporting the Board's determination that petitioner is unsuitable for parole and, therefore, petitioner was not deprived of due process of law. As such, the California Supreme Court's denial of petitioner's due process claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

## RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the petition and dismissing the action with prejudice.

September 6, 2007.